**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| ALOYSIUS M. OLIVER #B-51183, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 14-315 |
| | ) | |
| HOWARD HARNER, et al., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**AFFIDAVIT**

I, Howard Harner, being first duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1. I am employed as the Senior Chaplain at Menard (Menard) Correctional Center. I have been the Senior Chaplin for the last four years and employed at Menard for the last seven years. I am ordained as a Southern Baptist Minister. I have a bachelor's degree and Master's degree and post graduate work in the old testament and work in biblical counseling.

2. As Senior Chaplain, my responsibilities involve conducting religious services for patients, inmates, residents and employees; administering sacraments and other religious rites; and offering religious instruction. I counsel and advise inmates and patients on spiritual matters, personal, and institutional problems.

3. I am familiar with the allegations against me as stated in Plaintiff's Complaint.

4. In order to receive a religious diet at Menard, an inmate must submit a request form indicating the basis for the request.

**EXHIBIT**

**bobbles** F

5.  The request must contain written verification that the committed person is a member of a faith group that requires adherence to a particular diet and the specific requirements of the diet.

6.  Eligibility to receive an alternative diet for specific religious reasons shall be determined by the facility chaplain who may confer with a religious leader or faith representative of the faith group at issue.

7.  The facility chaplain and the religious leader or faith representative may interview the committed person.

8.  The Chaplaincy handbook explains how Departmental Rule 425.70 is to be interpreted and applied within the Department.

9.  Religious dietary requests by offenders in the Department are handled in accordance with the Chaplaincy Handbook and Administrative Directive 04.25.102.

10. The Chaplaincy Handbook explains that the "written verification" requirement is not to be restricted to written verification from an outside faith representative.

11. If the Department's own Offender Tracking System records show that the inmate has previously designated a specific affiliation, then this is recognized as the verification of an offender's self-identified religion.

12. The Chaplaincy Handbook also states that the Offender's religion does not have to actually require adherence to a particular diet.

13. If a particular diet is a general practice, though not a requirement of a faith, or if a particular diet is encouraged by a faith, or even if an individual is assuming a dietary restriction is viewed as a religious practice by a faith, this is sufficient basis for granting the diet request.

14. Further, if a dietary practice is the individual's own sincere interpretation of his/her faith based, for example, on the faith's creed or holy text (e.g. a personal interpretation of a Biblical passage), this is also sufficient basis for the request.

15. It is not the Department's policy to deny offenders religious diets consistent with their sincerely held religious beliefs.

16. On August 2, 2012, Plaintiff submitted a request for a Kosher diet. (Ex. B).  On August 6, 2012, I denied Plaintiff's request, stating that Plaintiff did not include a statement that a Kosher diet was his sincerely held religious belief or an interpretation of a religious book.  I also noted that Plaintiff was listed as an African Hebrew Israelite, not Yahwist/Hebrew Israelite as listed on his request for religious diet form.  (Ex. B)

17. On September 10, 2012, Plaintiff sent me a letter explaining that he was not an African Hebrew Israelite, but instead was a Yahwist/Hebrew Israelite.  I responded that he could change his religion and supplied him with a form to change his religion if he so desired.  I also explained to him that he could reapply for a Kosher diet.  (Ex. C)

18. On September 17, 2012, Plaintiff submitted a Request for Change of Committed Person's Religious Affiliation form, requesting to be changed to the Assembly of Yahweh.  On September 23, 2012, I approved Plaintiff's request.  (Ex. D.)

19. On January 16, 2014, Plaintiff submitted a request for a kosher diet. This request appears as page 18 in Court document 1. Plaintiff's request for a kosher diet was denied but Plaintiff was approved for a vegan diet. I denied Plaintiff's request for a Kosher diet because Plaintiff did not indicate what foods are prohibited by his religion or the specific requirements of the diet he is requesting. Without the specific requirements of the kosher diet requested, Menard is unable to ensure compliance with the requirements of an inmate's

religion. Additionally, a statement which includes the requirements of the diet requested assists prison officials in evaluating the sincerity of the request.

20. Additionally, Plaintiff told me that he received a kosher diet at Stateville. However, when I consulted the Offender Tracking System, Plaintiff was not listed as having a kosher diet.

21. I have spoken to Plaintiff on several occasions. I never told Plaintiff to change his religion or indicate that a change in religion will allow Plaintiff to receive a certain diet. I attempt to be fair and consistent when providing inmates with a religious diet.

22. I provided Plaintiff with a vegan diet as an accommodation.

23. The Illinois Department of Corrections maintains a list of items available to inmates at the Commissary that are designated as kosher. Attached as Ex. 2 is a true and accurate copy of the list of kosher foods available at the Commissary at Menard.

24. I have read the foregoing and affirm the facts contained herein are true and correct to the best of my knowledge and belief.

FURTHER AFFIANT SAYETH NOT.

s/ Howard Harner

HOWARD HARNER

SUBSCRIBED and SWORN to

before me this $11$ day of June. 2015.

s/ Jennifer Clendenin



JENNIFER CLENDENIN
OFFICIAL SEAL
Notary Public State of Illinois
My Commission Expires
May 29, 2018



```
S1 - HOST - IDOC - BlueZone Mainframe Display
File  Edit  Session  Options  Transfer  View  Macro  Script  Help

Connections: IDOC          Attention   PA1  PA2  PA3   Reset   PF01

OMORC013        ILLINOIS DEPARTMENT OF CORRECTIONS -- OTS         2/27/15
PAGE: 0001                RELIGION HISTORY INQUIRY                15:02:19

IDOC#: B51183 OLIVER, ALOYSIUS        1 C M  MEN-N2-08-43         LIFE

                                                    EFFECTIVE    END
        RELIGION                INSTITUTION            DATE      DATE

        ASSEMBLIES OF YAHWEH    MENARD                9 23 12      00
        AFRICAN-HEBREW ISRAELITE STATEVILLE           9 24 04   9 23 12
        NO RELIGION            BIG MUDDY RIVER        5  3 99   9 24 04








NEXT KEY DATA: IDOC #: B51183                PF7: PAGE BACK  PF8: PAGE FWD
INQUIRY COMPLETE                    PLEASE ENTER NEXT KEY DATA

S1   Ready (1) 10.201.112.17   CRTBEVOK   15:08:13 2/27/2015   NUM   00:07:32   22, 025
```

EXHIBIT

F-1



```
S1 - HOST - IDOC - BlueZone Mainframe Display
File  Edit  Session  Options  Transfer  View  Macro  Script  Help

Connections: IDOC                          Attention   PA1  PA2  PA3   Reset   PF01

OMOPA006              ILLINOIS DEPARTMENT OF CORRECTIONS -- OTS        2/27/15
PAGE: 0001             PROGRAM/ASSIGNMENT HISTORY INQUIRY              15:08:54

  IDOC#: B51183 OLIVER, ALOYSIUS          1 C M  MEN-N2-08-43          LIFE


                                     S  P              PLANNED              TERM
 -LOC-  ----ASSIGNMENT DESCRIPTION----  T -R-   --START-  -END-   -TERM-   -RSN-
  MEN   DISCIPLINARY SEG., LOCKUP       A  Y    4 14 14   4 14 15    00
  MEN   NO TOOLS, PARTICIPANT           A  N    4 14 14   4 14 17    00
  MEN   LOSS PRIV, COMMISSARY           A  N    4 14 14   4 14 15  4 14 15 CMPL
  MEN   VEGAN, PARTICIPANT              A  N    3  1 14   1 31 15    00
  MEN   LOSS PRIV, YARD                 T  N    4 14 14   7 14 14  7 14 14 CMPL
  MEN   CHAPLAINCY DEPT., PARTICIPANT   T  N   10  5 12     00     4 15 14 CMPL
  MEN   TEMP CONFINEMENT, LOCKUP        T  Y    4 14 14     00     4 14 14 SEG
  MEN   CHAPLAINCY DEPT., PARTICIPANT   T  N    1  9 13     00     4 14 14 CMPL
  MEN   UNASSIGNED, PARTICIPANT         T  Y    8 15 12     00     4 13 14 CHNG
  MEN   ORIENTATION, PARTICIPANT        T  Y    7  4 12     00     8 14 12 CHNG
  MEN   LOSS PRIV, COMMISSARY           T  N    7 10 12   7 25 12  7 25 12 CMPL
  STA   VEGAN, PARTICIPANT              T  N    5 25 12     00     7  3 12 TRAN

 NEXT KEY DATA:  IDOC #:  B51183
 PF7: PAGE BACK  PF8: PAGE FWD


S1   Ready (1)  10.201.112.17    CRTBEVOK      15:10:48 2/27/2015    NUM    00:10:07   21, 027
```



```
OMOPA006          ILLINOIS DEPARTMENT OF CORRECTIONS -- OTS          2/27/15
PAGE: 0002              PROGRAM/ASSIGNMENT HISTORY INQUIRY          15:08:54

    IDOC#: B51183 OLIVER, ALOYSIUS          1 C M  MEN-N2-08-43          LIFE

                                    S  P              PLANNED              TERM
    -LOC-  ----ASSIGNMENT DESCRIPTION----  T -R-    --START-   -END-   -TERM-  -RSN-
    STA    UNASSIGNED, UTILITY MAN         T  Y     8 10 07      00    7  3 12  TRAN
    STA    BLACK HEBREW ISRAELITE, PARTIC  T  N    12 27 07      00    7  3 12  TRAN
    STA    BLACK HEBREW ISRAELITE, PARTIC  T  N     2 14 08      00    7  3 12  TRAN
    STA    ALCOHOLICS ANONM., PARTICIPANT  T  N     4  5 11      00    7  3 12  TRAN
    STA    VEGAN, PARTICIPANT              T  N     8  1 07      00   10 29 11  DISP

    NEXT KEY DATA:  IDOC #:  B51183
    PF7: PAGE BACK  PF8: PAGE FWD
    INQUIRY COMPLETE                        PLEASE ENTER NEXT KEY DATA
```

an asterick (*) means "not allowed"     Religious Diets - COMMISSARY
a dash (-) means "not stocked"           May 21, 2013

| | Vegan | Lacto-Ovo | Kosher | | |
|---|---|---|---|---|---|
| Armour Meals | | | | asterick | |
| Back Country Nuggets, Asst | Vegan | | | | |
| Beef & Cheese, Trails Best | | | | asterick | |
| Beef Sausage, HALAL | | | Kosher | | |
| Cereal, Berry Crunch | Vegan | Lacto-Ovo | Kosher | | |
| Cereal, Blueberry Muffin | Vegan | Lacto-Ovo | | | |
| Cereal, Honey Nut | Vegan | Lacto-Ovo | Kosher | | |
| Chicken, Sweet Sue | | | | | dash |
| Crackers, Saltine | Vegan | Lacto-Ovo | Kosher | | |
| Crackers, Snack | Vegan | Lacto-Ovo | Kosher | | |
| Dip, French Onion | | Lacto-Ovo | | | |
| Dip, Jalapeno Cheese/Cheddar | | Lacto-Ovo | | | |
| Dragon Express, Spicy Veg HALAL | Vegan | Lacto-Ovo | | | |
| Flour Tortillas | Vegan | Lacto-Ovo | | | |
| Granola Bar, Fudge | | | | | dash |
| Granola Bar, Sweet & Salty | | | | | dash |
| Ham Chunks | | | | asterick | |
| Macaroni & Cheese | | Lacto-Ovo | | | |
| Mackerel in Oil, HALAL | Vegan | Lacto-Ovo | | | |
| Mayonnaise, Bago Indv Pks | | Lacto-Ovo | | | |
| Meat Stick, Jalapeno | | | | asterick | |
| Meat Sticks, Big Haus | | | | asterick | |
| Mrs. Dash Seasoning | | | | | dash |
| Oatmeal, Variety Pack, Sturms | | Lacto-Ovo | Kosher | | |
| Peanutbutter Squeezer | Vegan | Lacto-Ovo | | | |
| Picante Sauce | | | | | dash |
| Pickled Sausage, Mexicana | | | | asterick | |
| Ramen Noodles, asssorted flvrs | Vegan | Lacto-Ovo | | | |
| Refried Beans/Rick, Sevilla | | Lacto-Ovo | Kosher | | |
| Rice, Instant White | Vegan | Lacto-Ovo | | | |
| Rice, Spanish, Instant | Vegan | Lacto-Ovo | | | |
| Roast Beef, Shredded | | | | asterick | |
| Salmon | | | Kosher | | |
| Sardines in Hot  Tomato Sauce | | | | asterick | |
| Sardines in Soybean Oil | Vegan | Lacto-Ovo | Kosher | | |
| Spam, Singles | | | | asterick | |
| Spicy Refried Beans | Vegan | Lacto-Ovo | | | |
| Squeeze jelly (10 individual packets) | Vegan | Lacto-Ovo | | | |
| Sugar Twins Sweetener | Vegan | Lacto-Ovo | Kosher | | |
| Tortilla Stuffers, El Paso | | | | asterick | |
| Tuna in Water, HALAL | | | Kosher | | |
| Tuna, Chicken of the Sea | | | Kosher | | |
| Vegetables, Dehydrated | Vegan | Lacto-Ovo | | | |
| Chips, Uncle Ray, Asst 6-10 oz | Vegan | Lacto-Ovo | Kosher | | |
| Crunch N Munch | Vegan | Lacto-Ovo | Kosher | | |
| Sweet N Spicy Mix | Vegan | Lacto-Ovo | Kosher | | |

EXHIBIT

F - 2

an asterick (*) means "not allowed"       Religious Diets - COMMISSARY
a dash (-) means "not stocked"                    May 21, 2013

| Coffee, Maxima Columb | Vegan | Lacto-Ovo | Kosher | | |
|---|---|---|---|---|---|
| Coffee, Maxima Prem. | Vegan | Lacto-Ovo | | | |
| Coffee, T/C 8 oz Bag | Vegan | Lacto-Ovo | Kosher | | |
| Cool Off Drink Mix | Vegan | Lacto-Ovo | Kosher | | |
| *Crush Grape, Powder, Singles* | | | | | |
| Hot Cocoa | | Lacto-Ovo | Kosher | | |
| Tea Bags, Park, 100 ct | Vegan | Lacto-Ovo | | | |
| Candy Bars assorted varietys | | Lacto-Ovo | Kosher | | |
| Candy Bag, Jolly Rancher Asst. | Vegan | Lacto-Ovo | | | |
| Candy Bag, Starlight Mints | Vegan | Lacto-Ovo | | | |
| Double Dip Peanuts | | Lacto-Ovo | | | |
| Mixed Nuts w/Peanuts | Vegan | Lacto-Ovo | Kosher | | |
| Orange Slices | Vegan | Lacto-Ovo | | | |
| Peanuts, Chocolate Covered | | Lacto-Ovo | | | |
| Peanuts, Honey Roasted | Vegan | Lacto-Ovo | Kosher | | |
| Peanuts, Honey | Vegan | Lacto-Ovo | Kosher | | |
| Sour Cherries/Gummi Bears | Vegan | Lacto-Ovo | Kosher | | |
| Truffles, Chocolate, Lindor | | Lacto-Ovo | Kosher | | |
| Cookies, Lil Dutch-fudge | | | | | dash |
| Cookies, Oatmeal & Choc Chip | Vegan | Lacto-Ovo | Kosher | | |
| Cookies, Pnut Butter-Cream | Vegan | Lacto-Ovo | Kosher | | |
| Haas, Cakes (2 bx or 10 indiv) | | | | | dash |
| Nutty Bars, 12/Bx Lt Debbie | | Lacto-Ovo | Kosher | | |
| Oatmeal Crème, 12/Bx Little Debbie | | Lacto-Ovo | Kosher | | |
| Star Crunch 12/Bx Little Debbie | | | | | dash |
| Thin Mints | | Lacto-Ovo | | | |
| Toaster Pastry, Asst 6ct | Vegan | Lacto-Ovo | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| **Illinois** | **ADMINISTRATIVE** | Number | 04.25.101 |
|---|---|---|---|
| Department of | **DIRECTIVE** | Page | 1 of 5 |
| **Corrections** | | Effective | 5/1/2014 |

| Section | 04 | **Programs and Services** |
|---|---|---|
| **Subsection** | 25 | **Religious Issues** |
| **Subject** | 101 | **Chaplaincy Services** |

I.  **POLICY**

    A.  **Authority**

        730 ILCS 5/3-2-2 and 3-7-2

        20 Ill. Adm. Code 425

    B.  **Policy Statement**

        The Department shall employ chaplaincy staff and permit religious program volunteers, as authorized by the Chief Administrative Officer, to oversee religious activities conducted at correctional facilities.

II.  **PROCEDURE**

    A.  **Purpose**

        The purpose of this directive is to establish written instructions to staff regarding chaplaincy services.

    B.  **Applicability**

        This directive applies to all correctional facilities within the Department.

    C.  **Facility Reviews**

        A facility review of this directive shall be conducted at least annually.

    D.  **Designees**

        Individuals specified in this directive may delegate stated responsibilities to another staff person or persons unless otherwise directed.

    E.  **General Provisions**

        1.  The Director shall appoint a Religious Practice Advisory Board to provide guidance to the Department regarding religious activities, to recommend changes in policies relating to religion and to review and make recommendations to the Director regarding religious issues in accordance with Department Rule 425.

            a.  The Board shall consist of at least seven individuals, including:

**EXHIBIT**

_F-3_

*Illinois Department of Corrections*

| ADMINISTRATIVE DIRECTIVE | Effective 5/1/2014 | Page 2 of 5 | Number 04.25.101 |
|---|---|---|---|

(1)   At least three staff chaplains, representing at least three different religious affiliations; and

(2)   Administrative staff.

**NOTE:**  Legal staff representatives shall serve as advisors to the Board.

b.   The Director shall designate a chairperson, normally the Chief Chaplain, who shall maintain a list of religious faith groups and legal advisors from whom the Board may seek advice on religious issues.

c.   The composition of the Board shall be reviewed at least annually, and the Director may appoint or reappoint members.

2.   The Religious Practice Advisory Board shall ensure an informational Chaplaincy Handbook, approved by the Director, is maintained and distributed to each facility. However, such approval shall not constitute endorsement or recognition of the designated religions or their activities.  The handbook shall be reviewed at least annually and shall be updated as necessary.  The handbook that shall act as a guide and not an authoritative source may include:

a.   The main tenets of various religions, including rites and rituals self-reported by offenders;

b.   A listing of known religious holidays, their observances and work proscriptions; and

c.   Any known special diet, clothing or other religious articles required for the practice of the religious faiths included in the handbook.

3.   The Director shall designate a Chief Chaplain whose responsibilities may include:

a.   Establishing training programs for chaplains and religious program volunteers from the community;

b.   Scheduling and coordinating statewide chaplaincy programs or seminars as authorized by the Director or his or her designee;

c.   Providing guidance and advice to the Agency's Chaplaincy Program, the facility chaplains and the Chief Administrators concerning current and future policies;

d.   Directing expanded and enhanced facility programs and objectives statewide;

e.   Collaborating with interfaith agencies; and

f.   Overseeing training for the facility Chaplain I and Chaplain II positions, statewide.

4.   The Chief Administrative Officer of each facility shall designate a Chaplain II as the Senior Chaplain who shall:

a.   Serve as the principal advisor to the Chief Administrative Officer;

*Illinois Department of* **Corrections**

| ADMINISTRATIVE DIRECTIVE | Effective | Page | Number |
|---|---|---|---|
| | 5/1/2014 | 3 of 5 | 04.25.101 |

    b.    Design and direct an accommodated multi-faith program within the facility;

    c.    Schedule and coordinate approved religious activities at the facility, including identifying potential resources for conducting the activities.  In scheduling approved religious activities, the following factors shall be considered, but not be limited to:

        (1)    Availability of staff, time and space;

        (2)    The need to proportionately share the available time and space among accommodated religious groups;

        (3)    Safety and security concerns; and

        (4)    Other scheduled activities at the facility.

    d.    Prepare and submit a current schedule of all religious services and programs offered at the facility to the Chief Administrative Officer for approval.  The schedule shall contain the time, date, type and location of the activity.  Any amendments to the schedule shall be submitted to the Chief Administrative Officer for approval.  The approved schedule shall be made accessible to offenders.

    e.    Ensure Chaplaincy staff makes regular rounds at the facility, including regular visits to any special housing unit such as the segregation unit.

5.    Unless otherwise approved by the Senior Chaplain, offenders who are in general population, or who are otherwise approved by the Chief Administrative Officer, may only be permitted to attend regularly scheduled, non-denominational and inter-denominational religious activities or religious activities for a specific faith group that the offender has designated affiliation.

    a.    An offender's self-reported designated religious affiliation shall be entered in the offender data system of record upon admission to the Department.  An offender may choose to designate no affiliation.  Self-reported designated religious affiliations do not constitute endorsement or recognition of that religion by the Department.

    b.    If the designated religious affiliation is not currently available in the offender data system of record, the Senior Chaplain shall forward the designation request to the Religious Practice Advisory Board for review and recommendation.

    c.    After orientation, the designation may only be changed, or affiliation added, in the offender data system of record as approved by the Senior Chaplain of the offender's parent facility.

    d.    The Senior Chaplain may refuse to change the affiliation if he or she determines that the change is being requested for other than religious reasons.

6.    Facility Chaplains shall:

*Illinois Department of* **Corrections**

| ADMINISTRATIVE DIRECTIVE | Effective | | Page | | Number | |
|---|---|---|---|---|---|---|
| | | 5/1/2014 | | 4 of 5 | | 04.25.101 |

<blockquote>

a.      Provide for religious services on a regular basis and on specific religious holidays.

b.      Provide religious counseling at the request of offenders, staff or family members of offenders concerning their spiritual, social and family problems as determined necessary and appropriate, regardless of the person's religious beliefs or affiliation.

c.      Serve as a liaison between the facility and community religious organizations.

d.      Develop and conduct or facilitate educational and instructional religious programs.

e.      Coordinate the administration of religious rites, where appropriate.

f.      Provide offender orientation regarding:

> (1)      Basic services available through the Chaplaincy Office;
>
> (2)      The schedule of religious activities;
>
> (3)      The procedure for attending services and contacting chaplaincy staff; and
>
> (4)      The manner that religious requests are made.

g.      Have access to all offenders, regardless of their classification or status, and to all areas of the facility, including special housing units.

</blockquote>

7.      Each facility shall set aside a specific area, wherever feasible, such as a chapel, for religious activities. Religious symbols shall be covered or removed during religious activities for a faith which does not recognize such symbols. The religious activity area shall not contain any permanent or fixed religious symbols that cannot be covered or removed. Each facility shall provide an area to store religious materials for conducting religious activities.

**F.**      <u>**Offender Requests for Religious Accommodations**</u>

1.      The Senior Chaplain or facility chaplain shall review any offender requests regarding religious issues in accordance with Department Rule 425. This may include, but not be limited to, requests to:

<blockquote>

a.      Meet with a chaplain or a religious program volunteer;

b.      Schedule a specific religious activity;

c.      Obtain approval for an alternative diet based on documented, sincerely held religious beliefs;

d.      Attend religious activities outside the offender's faith or change religious affiliation;

</blockquote>

*Illinois Department of Corrections*

| **ADMINISTRATIVE DIRECTIVE** | **Effective** 5/1/2014 | **Page** 5 of 5 | **Number** 04.25.101 |
|---|---|---|---|

e.  Be relieved from an institutional program or assignment for a specific religious purpose; or

f.  Obtain religious articles and materials, including audio recordings not obtained directly from an approved manufacturer, retailer or distributor.

2.  The Senior Chaplain shall ensure documentation is maintained of approval or disapproval of responses to religious requests.

G.  **Requests to the Religious Practice Advisory Board**

The Chairperson of the Religious Practice Advisory Board shall review requests of a religious nature that have been referred to the Board and determine the course of review.

(1)  The request may be assigned to one or more Board members for review and recommendation.

(2)  The Board shall confer with religious leaders of other faith groups when it is determined necessary.

(3)  The Chairperson shall submit the recommendation to the individual who referred the request.

**Authorized by:**

*[Original Authorized Copy on File]*

**S. A. Godinez**
**Director**

Supersedes:
04.25.101          AD          5/1/1995
And as Amended 11/1/1995

**STATE OF ILLINOIS**
**DEPARTMENT OF CORRECTIONS**

# CHAPLAINCY HANDBOOK

# OF

# RELIGIOUS BELIEFS

# AND

# PRACTICES

August 2009



EXHIBIT

tabbies

F - 4

# **TABLE OF CONTENTS**

Chapter                                                                        Page

1. INTRODUCTION  ……………………………………….        6

2. DEPARTMENT RULE  425 ………………………………        7

3. RELIGIOUS AFFILIATION DESIGNATION & CHANGES ………..    18

4. RELIGIOUS DIET ISSUES …………………………………..   22

5. KNOWN DIETS for RELIGIONS on the OTS LIST ………………   30

6. RELIGIOUS GRIEVANCE ………………………………….    34

7. RELIGIOUS NAMES …………………………………….    35

8. MARRIAGE of Offenders…………………………………    36

9. HAIR and RELIGIOUS PRACTICE ………………………….    40

10. RLUIPA ……………………………………………….    42

11. DESCRIPTIONS of RELIGIOUS AFFILIATIONS on the OTS LIST

AFRICAN HEBREW ISRAELITE…………………………….    45

AFRICAN METHODIST EPISCOPAL………………………….    48

AGNOSTIC ……………………………………………… 51

AL-ISLAM (MUSLIM)……………………………………    52

APOSTOLIC……………………………………………    56

ASSEMBLIES OF YAHWEH……………………………….    58

ASSEMBLY OF GOD……………………………………    63

BAHA'I……………………………………………….    64

BAPTIST……………………………………………..    67

BETA ISRAEL…………………………………………    71

BLACK HEBREW ISRAELITE………………………………    74

2

BNAI NOACH.................................................................. 76

BUDDHIST..................................................................... 78

CATHOLIC..................................................................... 82

CHRISTIAN.................................................................... 84

CHRISTIAN IDENTITY......................................................... 86

CHRISTIAN SCIENCE.......................................................... 89

CHRISTIAN & MISSNRY ALLNCE................................................. 92

CHURCH OF CHRIST........................................................... 95

CHURCH OF THE BRETHREN..................................................... 98

COPTIC....................................................................... 101

DRUID........................................................................ 105

EAST ORTHODOX............................................................... 113

ECKANKAR.................................................................... 115

EPISCOPAL.................................................................... 118

GNOSTICISM.................................................................. 120

HEBREW ISRAELITE........................................................... 124

HINDU....................................................................... 125

HOUSE OF YAHWEH............................................................ 131

ISKCON (HARE KRISHNA)...................................................... 137

JEHOVAH'S WITNESS.......................................................... 140

JEWISH...................................................................... 142

LIVING CHURCH OF GOD ..................................................... 146

LUTHERAN.................................................................... 148

MENNONITES.................................................................. 149

3

MESSIANIC HEBREWS...............................................................152

METHODIST............................................................................157

MOORISH SCIENCE TEMPLE....................................................158

MORMON..............................................................................162

NATION OF GODS AND EARTHS.............................................. 165

NATION OF ISLAM..................................................................172

NATIVE AMERICAN................................................................182

NAZARENE............................................................................189

NO RELIGION.........................................................................191

ODINISM / ASATRU.................................................................192

ORDO TEMPLI ORIENTIS........................................................ 199

OTHER.................................................................................. 203

PAGAN .................................................................................204

PENTECOSTAL........................................................................208

PRESBYTERIAN...................................................................... 209

PROTESTANT......................................................................... 210

RASTAFARIAN........................................................................ 212

ROSICRUCIAN........................................................................ 215

SALVATION ARMY ................................................................. 218

SANTERIA.............................................................................. 222

SATANIST.............................................................................. 228

SCIENTOLOGY....................................................................... 233

SEVENTH DAY ADVENTIST...................................................... 240

SIKH..................................................................................... 243

SPIRITUALISTS...................................................................246

TAOISM............................................................................250

UNITARIAN UNIVERSALIST.............................................252

UNITY.............................................................................258

UNKNOWN.......................................................................260

WICCA............................................................................261

WORLDWIDE CHURCH OF GOD.......................................266

ZOROASTRIANISM...........................................................270

## INTRODUCTION

This handbook was prepared to provide information useful for chaplains, administrators and other Illinois Department of Corrections' (IDOC) staff on the beliefs and practices of various religions that inmates have self-designated as their religious affiliation and to assist chaplains and administrative personnel to appropriately facilitate the religious beliefs and practices of inmates within a correctional environment. The specific purposes are:

- to facilitate the provision of religious programs and activities for the faith groups represented by the inmates in IDOC;
- to present specific information and practices of various religions in such a way as to provide guidance to facility chaplains and administrators to make informed and effective decisions concerning religious issues which regularly arise so that the needs of both the correctional environment and the inmates' constitutional right of religion are met;
- to encourage consistency of religious practices throughout the Department while recognizing the mission and level of security of the different facilities.

This handbook is not a rule book nor an administrative policy and not intended for inmates or the public; but rather, it is just an internal informational resource for IDOC chaplains and administrators. This handbook attempts to accurately reflect the religious beliefs and practices of each described faith group; but, chaplains will need to also consider asserted idiosyncratic religious beliefs of each individual inmate in regard to religious accommodations requests. In sum, this handbook is a supplemental aid for implementing the current version of Department Rule 425 and any applicable Administrative Directive.

This handbook is not intended to be an exhaustive discussion of the beliefs and practices of all existing religions. It is limited to describing the religious affiliations which have been self-designated by one of more inmates at IDOC. The fact that certain religions are contained in this handbook does not constitute "endorsement" by IDOC of these particular religions; it just means these are religions that have been self-selected by inmates. Moreover, while the information provided is as accurate as possible, it is by no means infallible and certainly not comprehensive. The handbook is designed to provide a general background into the beliefs and practices of the religions contained in the handbook and to provide guidance with regard to some of the common religious request situations faced in a correctional setting. It is not intended to provide theological expertise. Any questions regarding a particular religion not addressed in the handbook should be directed to a faith representative of that faith or should be forwarded to the IDOC Religious Practice Advisory Board, c/o IDOC Chief Chaplain.

NOTE: IDOC makes no assertion on the accuracy of the content of this handbook. Because there are variations and deviations among the practices and beliefs within faith groups, the material provided is necessarily incomplete and may contain some inaccuracies.

# DEPARTMENT RULE 425

**Section**

425.10      Applicability
425.12      Definitions
425.15      Responsibilities
425.20      Procedure (Repealed)
425.30      Accommodation of Religious Beliefs
425.40      Religious Practice Advisory Board
425.50      Chaplains and Religious Program Volunteers
425.60      Religious Activities
425.70      Accommodation of Religious Diets
425.80      Religious Publications and Recordings
425.90      Religious Items
425.100     Institutional Work and Program Assignments
425.110     Requests for Religious Accommodations
425.120     Religious Grievances

**AUTHORITY**: Implementing Section 3-7-2 and authorized by Section 3-7-1 of the Unified Code of Corrections [730 ILCS 5/3-7-2 and 3-7-1].

**SOURCE**: Adopted at 8 Ill. Reg. 14398, effective August 1, 1984; amended at 19 Ill. Reg. 6515, effective May 1, 1995.

## Section 425.10  Applicability

This Part applies to the Adult, Juvenile, and Community Services Divisions.

(Source: Amended at 19 Ill. Reg. 6515, effective May 1, 1995)

## Section 425.12  Definitions

"Chaplain" means an individual who is commissioned, licensed, ordained, or endorsed as required by the individual's religious faith and with whom the facility has employed or contracted to conduct religious activities within a correctional facility.

"Chief Administrative Officer" means the highest ranking official of a correctional facility.

"Department" means the Department of Corrections.

"Director" means the Director of the Department of Corrections.

"Faith representative" means a religious program volunteer who is commissioned, licensed, ordained, endorsed, or otherwise accepted as a religious authority by the individual's religious faith.

7

"Religious activity" includes religious services, prayers, rituals, ceremonies, celebrations, study groups, and meetings.

"Religious leader" means a member of the community who is commissioned, licensed, ordained, endorsed or otherwise accepted as a religious authority by the individual's religious faith.

"Religious program volunteer" means a member of the community who is recognized by a faith group and who has been approved by the facility in accordance with 20 Ill. Adm. Code 435 to conduct specific religious activities on a volunteer basis.

(Source: Added at 19 Ill. Reg. _____, effective May 1, 1995)

## Section 425.15 Responsibilities

a) Unless otherwise specified, the Director or Chief Administrative Officer may delegate responsibilities stated in this Part to another person or persons or designate another person or persons to perform the duties specified.

b) No other individual may routinely perform duties whenever a Section in this Part specifically states the Director or Chief Administrative Officer shall personally perform the duties. However, the Director or Chief Administrative Officer may designate another person or persons to perform the duties during periods of their temporary absence or in an emergency.

(Source: Added at 19 Ill. Reg. 6515, effective May 1, 1995)

## Section 425.30 Accommodation of Religious Beliefs

a) Committed persons shall be provided reasonable opportunities to pursue their religious beliefs and practices subject to concerns regarding security, safety, rehabilitation, institutional order, space, and resources.

b) Participation in or attendance at religious activities shall be voluntary.

c) Committed persons shall not pressure or coerce other persons to join or participate in the activities of a particular religion.

d) Committed persons shall not engage in religious activities which may encourage violence against others or are likely to disrupt institutional safety or operations.

8

e)     Committed persons shall be requested to designate their religious affiliation during the orientation process. Such designation of religious affiliation does not constitute endorsement or recognition of that religion by the Department.

f)     Committed persons may only attend the religious activities of their designated religion or non-denominational religious activities, except as provided in subsection (g) of this Section pursuant to Section 425.60.

g)     Committed persons requesting to attend a religious activity of a faith other than their designated faith shall submit their written request to the facility chaplain who will determine whether their attendance at the activity can be accommodated based on factors such as security, safety, rehabilitation, institutional order, space, and resources.

h)     Committed persons desiring to designate their religious affiliation after the orientation process or to change their designated religious affiliation shall submit the written request to the facility chaplain. The facility chaplain may refuse to change the affiliation if it is determined that the change is being requested for other than religious reasons. This determination may be based, among other matters, on the frequency of changes or a pattern of changing religious affiliation prior to a particular faith group's scheduled holiday or celebration.

(Source: Added at 19 Ill. Reg. 6515, effective May 1, 1995)

## Section 425.40  Religious Practice Advisory Board

a)     The Director shall appoint a multi-denominational Religious Practice Advisory Board comprised of legal, administrative, and chaplaincy staff. One of the members of the Board shall be designated as chairperson.

b)     The Board shall, among other matters:

   1)     Provide guidance to the Department regarding religious activities.

   2)     Review and make recommendations regarding designated:

      A)     Religious grievances filed by committed persons;

      B)     Requests from committed persons for religious diets, non-traditional religious symbols, headgear, clothing, and other religious items;

      C)     Requests from committed persons for religious activities not currently offered at the correctional facility and for religious activities permitted under Section 425.60(f);

9

D)   Requests from committed persons for relief from a work assignment or institutional program for specific religious reasons; and

E)   Issues involving the training, screening, and reimbursement of religious volunteers.

c)   The Board shall confer with religious leaders or faith representatives from various faith groups regarding the validity and legitimacy of the religious request and the sincerity of the committed persons' beliefs, as the Board determines necessary.

(Source: Added at 19 Ill. Reg. 6515, effective May 1, 1995)

### Section 425.50  Chaplains and Religious Program Volunteers

a)   The Adult and Juvenile Divisions may utilize chaplains and religious program volunteers on a full-time or part-time basis.

b)   Religious program volunteers who provide religious activities to committed persons shall not normally be reimbursed for travel expenses. However, the Chief Administrative Officer may approve reimbursement for travel expenses, not to exceed the reimbursement rate applicable to State employees. In determining whether to approve reimbursement, the Chief Administrative Officer shall consider the recommendation of the Religious Practice Advisory Board as well as factors such as: distance traveled, number of hours at the facility, frequency of visits, fiscal resources, availability of other volunteers of that faith, and whether religious program volunteers of religious groups of comparable size have been compensated for travel of a similar nature.

(Source: Added at 19 Ill. Reg. 6515, effective May 1, 1995)

### Section 425.60  Religious Activities

a)   Religious activities approved by the Chief Administrative Officer shall be conducted or supervised by a chaplain or religious program volunteer.

b)   The Chief Administrative Officer, after consultation with the facility chaplain, shall regulate the time, place, and manner in which religious activities are conducted. The Chief Administrative Officer may limit, restrict, discontinue, or deny a religious activity based upon concerns regarding security, safety, rehabilitation, institutional order, space, or resources.

c)   Nothing in this Part shall require the provision of group religious activities to committed persons in impact incarceration program facilities, reception

10

and classification centers, or in segregation areas, the condemned unit, or specialized housing units within the facility, such as the hospital.

d) Nothing in this Part shall require the Department to provide each separate religious group or sects within a group with a chaplain or with separate religious activities regardless of the size of the religious group or the extent of the demand for the activities.

e) Committed persons shall be prohibited from assuming a position of authority or leadership over other committed persons. This does not preclude committed persons from actively participating in religious activities.

f) Religious activities for which religious program volunteers or chaplains of that particular faith are unavailable on a permanent or protracted basis may be permitted if the following conditions are satisfied:

   1) The committed persons submit written verification to the facility chaplain that they attempted to locate and secure the services of religious leaders or faith representatives from the community and that such persons refused or were not approved to conduct religious activities;

   2) Security, program, or chaplaincy staff are available to attend and supervise the religious activity;

   3) Written verification that attendance at existing religious activities does not satisfy the recognized tenets of their faith is received;

   4) Written agreement by a chaplain, faith representative, or recognized religious leader of that faith group to provide general oversight and guidance of the religious activity is received;

   5) The Religious Practice Advisory Board recommends approval; and

   6) The committed person submits a copy of any proposed sermon or doctrinal interpretation to the Chief Administrative Officer or staff designated to supervise the religious activity for review and approval prior to delivery, based on safety and security concerns.

g) The staff supervisor may call upon various committed persons to guide portions of the religious activity subject to safety and security concerns.

h) Religious activities defined under subsection (f) of this Section shall be prohibited where based solely on the temporary or occasional unavailability of a chaplain or a religious program volunteer.

11

i)    The Chief Administrative Officer may limit, restrict, or discontinue religious activities permitted under subsection (f) of this Section based upon concerns such as security, safety, rehabilitation, institutional order, space, or resources and may require periodic rotation of committed persons permitted to guide portions of religious activities.

(Source: Added at 19 Ill. Reg.6515, effective May 1, 1995)

## Section 425.70  Accommodation of Religious Diets

a)    Committed persons shall be permitted to abstain from any foods the consumption of which violates their required religious tenets.

b)    Any foods which contain pork or pork by-products shall be identified in accordance with 20 Ill. Adm. Code 502.20.

c)    A committed person may submit a written request to the facility chaplain to receive an alternative diet for specific religious reasons. The request must contain written verification that the committed person is a member of a faith group that requires adherence to a particular diet and the specific requirements of the diet. Eligibility to receive an alternative diet for specific religious reasons shall be determined by the facility chaplain who shall ordinarily confer with a religious leader or faith representative of the faith group at issue. The facility chaplain and the religious leader or faith representative may interview the committed person.

d)    A committed person requesting a dietary modification required by a specific religious holiday or ceremony must submit a written request to the facility chaplain 45 calendar days before the holiday or ceremony. The request must contain verification that the committed person is a member of a faith group requiring the dietary modification and the specific requirements of the dietary modification. Eligibility to receive an alternative diet for a specific religious holiday or ceremony shall be determined by the facility chaplain who shall ordinarily confer with a religious leader or faith representative of the faith group at issue. The facility chaplain and religious leader or faith representative may interview the committed person.

e)    A committed person who does not adhere to the alternative diet shall no longer receive the alternative diet, unless otherwise approved by the Chief Administrative Officer.

(Source: Added at 19 Ill. Reg. 6515, effective May 1, 1995)

## Section 425.80  Religious Publications and Recordings

a)    Committed persons may obtain religious publications or recordings in accordance with this Part and Departmental Rules governing purchasing,

12

incoming mail, publications, and personal property (see 20 Ill. Adm. Code 205, 525, and 535) or through donations distributed by the chaplain.

b) Religious publications shall be submitted to the Publication Review Committee for review pursuant to 20 Ill. Adm. Code 525:Subpart C. The Publication Review Committee may confer with the chaplain.

c) Committed persons shall be permitted to receive or possess commercially made religious audio cassettes, sealed in cellophane or similar material, that are not available through the commissary and are sent directly from a manufacturer, retailer, or distributor. Committed persons shall also be permitted to receive or possess religious audio cassettes directly from religious organizations. The Chief Administrative Officer or chaplain may review and deny such audio cassettes if they are deemed to pose a threat to the safety or security of the institution. If such audio cassettes are denied, they shall be submitted to the Religious Practice Advisory Board for review.

(Source: Added at 19 Ill.Reg. 6515, effective May 1, 1995)

**Section 425.90  Religious Items**

a) Committed persons may obtain religious symbols, clothing, and other items in accordance with this Part and Departmental Rules governing purchasing, incoming mail, and personal property (see 20 Ill. Adm. Code 205, 525, and 535) or through the chaplain.

b) Committed persons shall be permitted to have up to two traditionally accepted religious symbols or religious symbols which have been authorized by the Religious Practice Advisory Board and which represent their designated faith.   These may include but not be limited to medals, medallions, scapulas, or prayer beads.

c) Religious items may be limited, restricted, or denied by the Chief Administrative Officer based upon concerns such as safety, security, rehabilitation, institutional order, space, resources, or facilitation of gang identification, recruitment, or activity.

   1) Certain items, such as candles and incense, shall be restricted by the Chief Administrative Officer or chaplain to use for religious activities only. Such items shall be stored in a designated area of the facility and shall be available upon request for use during approved religious activities held in the chapel or other designated common area.

   2) Religious symbols shall not exceed two inches in height or width. The chain upon which a medal or medallion is attached shall not

13

exceed 24 inches in length. The combined value of the medal or medallion and chain shall not exceed $50.

3)    The Department may restrict the color of religious items.

4)    Rosary beads shall be a solid color, either black, brown, or white, and shall not be permitted to be worn as jewelry.

5)    Medals or medallions shall not contain precious gems or stones.

6)    Medals or medallions shall not be of a design that could be used as a weapon or to conceal contraband.

7)    Religious symbols attached to pins shall not be permitted.

8)    Prayer rugs may be permitted if utilized as a component of the committed person's faith but will be limited to the immediate living area during prayer or the area of religious service.

d)    Committed persons may wear articles of religious clothing, including but not limited to robes, prayer shawls, or talits, only in their immediate sleeping areas during prayer or in the area of religious service if verification is submitted that the clothing is worn as a component of their religion.

e)    The wearing of religious headgear, including but not limited to fezzes, kufis, and yarmulkes, shall be limited only to the committed person's immediate sleeping area during prayer and to the area of religious service provided that verification is submitted that the wearing of the religious headgear is required by the committed person's designated faith.

(Source: Added at 19 Ill. Reg. 6515, effective May 1, 1995)

### Section 425.100 Institutional Work and Program Assignments

a)    Committed persons shall be relieved from a work assignment, without pay, on a recognized religious holiday or celebration which prohibits work or if the work assignment violates the specific requirements of the committed person's faith subject to concerns regarding safety, security, rehabilitation, institutional order, space, and resources. Committed persons must initiate the request to be relieved from the assignment by submitting a written request to the Chief Administrative Officer not less than thirty calendar days prior to the holiday.

b)    The Chief Administrative Officer may relieve a committed person from an institutional program or assignment if a religious activity is scheduled at the same time and the committed person has designated that faith,

14

subject to concerns regarding safety, security, rehabilitation, institutional order, space, and resources.

(Source: Added at 19 Ill. Reg. 6515, effective May 1, 1995)

## Section 425.110  Requests for Religious Accommodations

a) Committed persons requesting religious items shall submit the request in writing to the facility chaplain and shall be required, if requested by the facility chaplain or the Religious Practice Advisory Board, to include written verification from an outside faith group or from a religious authoritative source that the religious item is necessary for the practice of the committed person's religion or that the item is a symbol or integral part of the person's religion.

b) Committed persons requesting religious activities of the type not offered by the Department shall submit the request in writing to the facility chaplain and shall be required, if requested by the facility chaplain or the Religious Practice Advisory Board, to submit the following information:

   1) Written verification that other committed persons belong to that faith and are interested in attending such religious activities;

   2) The names, addresses, and telephone numbers of the outside leaders of the faith;

   3) Copies of the by-laws, charters, or articles of incorporation, to the extent available;

   4) Written verification of the religion's practices, requirements, historical origins, size of membership population, organization hierarchy and structure, role of religious personnel, and dietary restrictions;

   5) The time, place, and nature of any religious activities to be conducted and the identity of the religious program volunteer who will conduct the requested religious activities as well as their address, telephone number, and credentials; and

   6) The documentation required under Section 425.60.

c) Committed persons requesting religious accommodations not addressed in Section 425.110 may be required, if requested by the facility chaplain or Religious Practice Advisory Board, to provide some or all of the following:

   1) The names, addresses, and telephone numbers of the outside leaders of the faith;

15

# RELIGIOUS AFFILIATION DESIGNATION & CHANGES

Initial Affiliation Designation

     DR 425.30(e) states "Committed persons shall be requested to designate their religious affiliation during the orientation process. Such designation of religious affiliation does not constitute endorsement or recognition of that religion by the Department." Per this rule, inmates should be requested to, but not be required to, designate their religious affiliation when they come into the custody of the Department. Inmates do not have to provide any proof of membership for their initial religious affiliation designation made during orientation. The only limitations on their self-designation is that the religious affiliation must be an actual existing religion (i.e. not something that the inmate is making up) and not be a "hate group" (e.g. KKK).

     The initial religious affiliation designation may occur at the Reception & Classification center (R & C) or may occur at the inmate's first assigned facility after leaving the R & C. This means that if an inmate does not make an initial religious affiliation designation during the first phase of orientation at an R & C, that inmate should be allowed to make an initial religious affiliation designation during the next phases of orientation at his/her first assigned facility.

     After R&C and initial facility orientations, however, any subsequent change of religious affiliation designation should follow DR 425.30 (h), which states "Committed persons desiring to designate their religious affiliation after the orientation process or to change their designated religious affiliation shall submit the written request to the facility chaplain."

     Thus, when an inmate transfers from one facility to another facility and attends orientation again at that new facility, that inmate does not get to change his religious affiliation without submitting a written request to the chaplain. That inmate is in the new facility's orientation just to get him oriented to the procedures at the new place and is not in initial orientation for IDOC; the inmate's religious affiliation does not change unless the inmate submits a change request and provides a basis for such a change request.

Change of Religious Affiliation Designation

     There should be individual consideration of any request for change of religious affiliation designation in accordance with **D.R. 425.30(h)**, which states, "Committed persons desiring to designate their religious affiliation after the orientation process or to change their designated religious affiliation shall submit the written request to the facility chaplain. The chaplain may refuse to change the affiliation if it is determined that the change is being requested for other than religious reasons. This determination may be based, among other matters, on the frequency of changes or a pattern of changing religious affiliation prior to a particular faith group's scheduled holiday or celebration."

     Basically, per this Rule, the Chaplain is to determine whether the religious affiliation change request is sincere or if the affiliation change request is for some reason other than a religious reason. While the inmate's providing written verification from an outside faith leader that the inmate belongs to the religious group is one way for the Chaplain to make this determination, it is neither the only way nor the required way. The quoted Rule does not require that an inmate provide the Chaplain with written

verification from an outside faith representative that he is a member of the particular faith to which he wants to change. So, if the inmate does not have any outside leader to verify his joining or membership in or practice of the new religious affiliation, the chaplain can, and should, ask for some other information to check on the sincerity of the change request. An inmate could be asked how or from whom he learned about the new religion. Is this a religion he grew up in or participated in before his incarceration? Has he taken any class/course in it, or been corresponding with a faith leader about it, or read books about it, etc.? An inmate could be asked.what he knows about the new religion to which he claims to now follow and what the practices of this religion are. Does he know what its basic tenets or beliefs are? Does he know what one does to practice this religion? If the answers to such questions indicate that the inmate has a sincere desire to change his religious affiliation and practice a new religion, his change request should be granted. If the answers indicate there may be another reason for the request (for example, if the inmate says he just wants the diet that the religion has), the request may be denied.

When an inmate submits a written request for religious affiliation change, he is asserting that he is actually a member or adherent of that religious affiliation and that he is sincere in this religious belief. These are low, easily met standards. These standards exist so that a Chaplain may deny a request to change the affiliation if the Chaplain determines the change is being requested for other than a religious reason, such as to participate in an upcoming religious feast, or merely to get onto a preferred diet, or to imitate a cellmate, or to follow the dictate of a gang leader who may want to use a religious service as a cover for a meeting, etc. Additionally, the inmate may also be requested to provide some information or documentation to substantiate that the wanted affiliation actually exists as a bona fide religion if IDOC does not know about the requested affiliation.

When the requested religious affiliation is unknown to IDOC and information about it cannot be readily found by the Chaplain, or when the requested affiliation appears to IDOC to be just an alternative name for a religion already on the OTS religious affiliations list (like Hare Krishna is an alternative name for ISKCON, the International Society for Krishna Consciousness), or when the requested affiliation appears to be a "hate group" rather than a real religion, then the inmate may be requested to provide some documentation (like from an outside faith leader/representative or from an authoritative religious source) to show that his requested affiliation does actually exist as a separate religion, faith group or system of religious beliefs in the outside world. IDOC merely requires an inmate who is requesting a religious affiliation change to demonstrate that the requested religion exists in free society and, with the exception of excluding "hate groups" for security reasons, IDOC is not really in the "theology business" of deciding if an outside organized group that calls itself a religion or an outside existing purported church is really a "religion". Thus, this last standard is not to be used to decide if an existing outside group (e.g. Freemasonry) is a "religion" or something else (e.g. fraternal society) but rather just to reject inmates' requests for their own self-created religions.

19

# RELIGIOUS DIET ISSUES

Currently **DR. 425.70** says: *A committed person may submit a written request to the facility chaplain to receive an alternative diet for specific religious reasons. The request must contain written verification that the committed person is a member of a faith group that requires adherence to a particular diet and the specific requirements of the diet. Eligibility to receive an alternative diet for specific religious reasons shall be determined by the facility chaplain who shall ordinarily confer with a religious leader or faith representative of the faith group at issue. The facility chaplain and the religious leader or faith representative may interview the committed person.*

Based on the federal law called Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the federal courts' interpretation of RLUIPA, IDOC is careful in how this DR section is applied, especially in two respects. First, the "written verification" requirement is not to be restricted to written verification from an outside faith representative, and is applied in a very minimal manner. If the inmate's own written request states he belongs to or practices a particular religion, this may be acceptable as the written verification. If IDOC's own OTS records show that the inmate has previously designated a specific religious affiliation, this should be accepted as the written verification. And, second, the religion does not have to actually require adherence to a particular diet. If a particular diet is a general practice, though not a requirement of a faith, or if a particular diet is encouraged by a faith, or even if an individual's assuming a dietary restriction is viewed as a religious practice by a faith, this is sufficient basis for granting the diet request. Moreover, if a dietary practice is the individual's own sincere interpretation of his/her faith based, for example, on the faith's creed or holy text (e.g. a personal interpretation of a Biblical passage), this is also sufficient basis for the request.

GRANTING A RELIGIOUS DIET REQUEST

Look to **DR 425.70 Accommodation of Religious Diets**. The aim of DR 425.70 is to accommodate the religious dietary requirements of inmates. An inmate has a right to receive a diet that is consistent with his religious beliefs. This is a constitutional right under the First Amendment. Making it very difficult for an inmate to obtain a diet required or motivated by his religion would be improper and could result in serious legal liability for the Department and for the individuals involved. The checking of membership in a faith group prior to giving an inmate the diet of that faith group is intended to check sincerity and bar someone who is not of a particular faith group from getting that faith's religious diet simply as a personal food preference. But, this rule is not meant to make it an impossible or even a difficult task for any inmate to get the diet practiced by his chosen faith group. In essence, it is to be a very low, readily met standard.

A diet request should contain three elements: (1) that the committed person has a particular faith; (2) that a particular diet is wanted as a practice of the particular faith; and (3) the specific requirements of the particular diet.

The first element of being in the particular faith group, depending on the faith group, can be demonstrated in different ways. If the faith group is one that literally has a written certificate of membership or registration in a parish or church, then the inmate

22

may be asked to provide that. If the faith group is one that has a recorded formal entry into membership by an activity, such as baptism, then the inmate may be asked to provide a copy of that, such as a baptismal certificate.   If an inmate can produce some official membership documentation, like a baptismal certificate, a church membership card, registration in a church, etc. that is great. Many inmates won't be able to do that. A faith group may not have any formal or written membership rolls. For many faith groups, anyone can be a member or adherent simply by choosing to do so. For the numerous faith groups that anyone can belong to simply by choice, the inmate's own written statement that he is an adherent, especially if supported by his attendance at any religious services and activities available for that faith group (and conversely his not participating as a member in any other faith group), is sufficient "verification" that he is part of such a faith group.

In regard to the second element, because providing special diets is a genuine fiscal and administrative burden, IDOC distinguishes between diets of personal preference, (such as persons who want to be vegetarians for philosophical, health or environmental reasons) and diets required by or a practice of a particular religion. If an inmate does not personally possess literature or documentation that demonstrates this second element, the inmate may be able to satisfy this requirement by giving the chaplain an outside religious leader or faith representative of the faith group at issue to confer with. This applies only where IDOC does not already have knowledge about the particular faith group's dietary practice. When the diet request concerns a faith group that is well known to have a particular dietary requirement, the inmate should not be required to provide any further written verification. It is a waste of the facility chaplain's time to make each new inmate who is a member of a faith group separately come up with the same proof. And, it would be incongruous to deny a diet to someone in a faith group on the basis that he doesn't have contact with an outside leader and can't readily show that the diet is practiced by that faith group if there are others of that faith group in the facility being given the diet.

The third element concerns the specific requirements of the particular diet. Again, if the diet of the faith group is well known, it is a waste of time and an unnecessary burden on inmates to make each new inmate who is a member of the faith group to separately come up with the information. But, for the first instance requestor/s this is important. Obviously IDOC must know what a diet consists of to possibly provide it.

Most often a religious diet requires only the avoidance of certain items and not the presence of any specific items. For example, an inmate may sometimes request specific foods items (e.g. soy nuts), when his religion does not require this or any specific food item, but rather just requires the avoidance of an item or items (e.g. meat). While specific food items may occasionally be needed for a particular religious feast (e.g. the Passover meal), it is rare that specific food items are needed for a daily diet. And, it is up to IDOC, based on fiscal concerns and nutritional standards, to make up menus and choose the specific food items that fit a religious diet. Thus, IDOC will provide food items that fit within a religion's diet, but does not have to provide more costly preferred items. (For example, if a Muslim inmate declared that he could not eat any meat other than Halal meat, which IDOC does not purchase primarily due to its greater cost and lesser availability, IDOC may accommodate this inmate's religious dietary belief by providing a meatless or vegan diet.)

23

If the chaplain approves the religious diet request, the approval and the type of diet is told to the dietary manager per the facility procedure.

Here are some "frequently asked questions" about diet:

**How does an inmate get a religious diet?  What are the steps for inmate and chaplain?**

Step one: an inmate must make a written request to the facility's Senior Chaplain for approval of an alternative diet based on religion.  Any inmate who makes an oral request should be told that all requests for an alternative diet on a religious basis must be made in writing to be considered.  This is a real distinction.  It is not that a diet is to be denied if there is no written request.  It is that there cannot be, will not be, and is no consideration of any diet request if there is no written request.  If not in writing, it's a matter of "no consideration", not a matter of approval or denial.  There simply should not be any consideration of any religious diet request unless and until the facility chaplain gets a request in writing from the inmate.  Nonetheless, it is a good practice for a chaplain to document any oral request.  For example, the chaplain could send the inmate a memo saying you mentioned wanting a religious diet in conversation on this date and this memo is to confirm to you that any such request must be made in writing per the DR in order to be considered.  And, the chaplain could include a copy of a blank diet request form.

The religious diet request must be in writing.  And, the approval that specifies the diet given and the date approved should be in writing too.  This then provides documentation for IDOC for any later dispute or review.  However, the request/ approval form  is not really a "contract" or an "agreement".  This is because an inmate has a constitutional right to a diet consistent with his religion, and he does not have to agree to anything, i.e. give, to use legal contract terms, any "consideration", in order to get a religious diet.

Step two: the chaplain checks (a) if the inmate does have the religious affiliation that he named in his diet request and (b) whether the named religious affiliation does have the specified diet as a religious practice.  This may include contacting an outside faith representative to get information.

Step three: the chaplain considers the sincerity of the individual inmate's request.

Step four: the chaplain approves or rejects the religious diet request.

Step five: if the chaplain approves the request, then the request goes to the AWP for review, if the facility requires this, and then goes to the Dietary Manager per the facility's practice for implementation.  If the chaplain rejects the request, the reason for the denial should be documented and the inmate informed.

**How is "sincerity" demonstrated by an inmate and/or judged by a chaplain?  What is the test for sincerity?**

In determining the subjective good faith of an inmate in requesting the accommodation of a religious diet (or the accommodation of any other specific practice/belief), the Chaplain may have a face to face interview with the inmate and may consider, among other matters:

- Past situations in which the offender has identified himself as a member of a particular religion.  (e.g. has he frequently switched religions, etc.)

24

- The inmate's demeanor.
- Actions of the inmate that have are or have been consistent with or inconsistent with the belief/practice. (e.g. has he on his own been avoiding meat at meals, or has he been buying commissary items contrary to the requested diet)
- The grounding of the request in an authentic or known religion.
- The length of time of affiliation with the particular religion. (This includes not only how long he may have this religion as his OTS religious affiliation, but also whether he practiced this religion at any time prior to imprisonment.)
- The inmate's own knowledge about the religion and the particular practice/diet. (Caveat: This knowledge criterion applies if the religious affiliation is a matter of choice. It does not fit, however, if the religious affiliation exists because of bloodline.)
- Any pertinent surrounding circumstances. (e.g. what's the diet of the inmate's cellmate; are members of the inmate's gang affiliation all making the same request, etc)

If an inmate who changed his religious affiliation simultaneously or very shortly thereafter requests a religious diet that comports with that new religious affiliation, that religious diet <u>cannot</u> be withheld for a time period (e.g. 6 months or a year) to see if the inmate is sincere about the new religion. Withholding a requested religious diet just to "test the sincerity" of an inmate's religious affiliation change would <u>not</u> be appropriate.

**Can compliance with religious diets be monitored?**
Yes.

**What is noncompliance?**
Examples of noncompliance are: taking a food tray other than the special diet tray; taking, trading for or accepting food from another inmate's regular food tray; skipping meals/not taking special food trays without any justification; buying food items from commissary that are contrary to their religion's diet; having in their possession food items that are contrary to their religion's diet.

Caveats: 1. If inmates generally are allowed to skip as many meals as they want, it is problematic to have any negative consequence for inmates on religious diets who skip meals.
2. If an inmate is put on a special diet that is stricter than his religion requires (example, if the religion requires vegetarian, but the facility does not make an ovo-lacto vegetarian diet, and just has the strict vegetarian or vegan diet, so the inmate is given the vegan diet (which is a permitted practice, since the inmate is not being given any food that is prohibited by his diet) then if the inmate buys at commissary or has in his possession a food item (e.g. a dairy item or item with milk in it) that is contrary to the diet that he is on (i.e. vegan) but not contrary to the diet his religion practices (i.e. vegetarian), the inmate should <u>not</u> be viewed as being in noncompliance with his religious diet. This point applies to commissary items; an inmate on, for example, a vegan diet as a religious accommodation still cannot take or trade for or accept a

vegetarian food item from another inmate's regular food tray if the facility prohibits this practice as trading or trafficking.

**If an inmate is found to be non-compliant with his requested and approved religious diet or to routinely not take his diet tray, what, if anything, should IDOC do? What can IDOC do to keep from being manipulated with religious diet requests?**

First of all, it should be difficult for inmates to violate a specially approved diet by taking a regular food tray. Inmates on a religious diet should be allowed only to get that diet tray, and should not have the opportunity of taking a different or regular food tray. This could be done by having all inmates on a special diet in a separate food line. Also, inmates on a religious diet who are seen to have food from a regular food tray can be ticketed for possession of unauthorized property or for trading and trafficking as long as it is the policy at the facility that inmates cannot take or accept food from another inmate's food tray.

If a facility has documented some dietary violations by a particular inmate, the chaplain should counsel that inmate, with the emphasis being that the inmate's failure to adhere fairly consistently with the requested and provided diet is casting doubt on his religious sincerity.

Eventually, if dietary violations persist, the inmate may be removed for the special diet. At the time of the removal, the inmate should be informed (1) that his repeated dietary violations made IDOC doubt his sincerity and (2) that he may request the resumption of the religious diet after a set time.

**How should a transfer inmate's religious diet request be handled?**

Upon transfer from one facility to another facility, an inmate should not have a problem continuing on the religious diet that he may have been getting for years elsewhere. If an inmate has been approved for a religious diet at one facility, this approval and diet should follow him automatically to any other facility. An inmate should not have to provide any further information or verification at the new facility that his religion practices the particular diet or that his request is sincere. To reiterate, once an inmate has received approval for a religious diet at a facility, that approval should remain effective, regardless of any facility transfers, for the entire term of his incarceration, absent some later indication of fraud or scam or abandonment of the religion. A transfer should not affect a religious diet approval. An approval should be revoked only for reasons that directly bear on the diet approval itself, such as if the inmate changes his religious affiliation or the inmate requests removal from the diet or the inmate himself does not adhere to the alternative diet or there is a court ruling on the issue, etc.

*How can this be smoothly done?* There are a couple of possible future agency-wide options under consideration. One option is to add a religious diet field to the OTS screen. If this is done, then all transferred inmates with religious diets could be easily identified and continued on their diets  Another option would be to add a diet designation – such as "V" or "O" or "K" for vegan, ovo-lacto vegetarian or kosher – behind the religious designation code that is on the back on inmates' id cards; however, this would

26

entail the cost of new id cards for all inmates on religious diets, which may not fit into IDOC's tight budget, and id cards don't move with transferring inmates.

At the present time, a facility can create tracking of religious diets immediately, and without adding an OTS field, by putting religious diet information on OTS in the Program/Assignment listing for each inmate. For example, the entry may say "Vegan" or "Lacto-ovo Participant" and the start date; then, if the inmate changes diet for whatever reason, an ending date is added to the start date. Thus there is a permanent record of what dates an individual inmate was getting a particular religious accommodation diet.

**Can inmates be required to sign for their religious diet trays?**

Yes. Definitely. Inmates participating in special diets may be required to sign for receipt of their meal. Signing for receipt of a meal is not a substantial burden on the practice of any religion.

Furthermore, IDOC has genuine penological reasons for such a requirement: First, such record keeping proves for IDOC that the appropriate special meal went to the correct person and that an inmate approved for a special diet did actually get that diet. Second, such record keeping may help in assessing the sincerity of the religious diet requester. Third, this may help track food waste and food budgeting allocations.

**Can an inmate's religious diet be revoked?**

Yes, but not for a single instance of non-compliance. Nor should revocation be done without warning/counseling of this possible consequence, with the emphasis that the inmate's behavior is giving IDOC a basis to question his religious sincerity. In considering any revocation decision, the essential focus is whether the inmate's violation of his professed religious diet have been so numerous or egregious and done knowingly so that a reasonable person would conclude that the inmate is not sincere in his asserted religious diet belief.

Religious diet revocation is a complex issue. The fundamental starting point for any inmate religious diet issue is that an inmate has a constitutional right to receive a diet that is consistent with his sincerely held religious beliefs. Per D.R.425.70(e), revocation of a diet may occur against the wishes of the inmate, if an inmate violates the diet. However, if an inmate is taken off a religious diet because he has been caught violating the diet, it must be made clear that the revocation is due to the violation having caused a question about his sincerity. Revocation cannot be as discipline for violating the diet nor as discipline for violating dietary rules nor as punishment for religious "backsliding". Correlatively, if an inmate violates some other tenets or practice of his religious affiliation (e.g. by not saying required prayers, not fasting, etc.) he may not be removed from the religious diet; IDOC cannot require an inmate to be a perfect practitioner of a religion in order to get the religious diet required by a religion or an inmate's religious beliefs.

Considerations prior to a revocation decision include: Had the inmate been informed, when the diet was initially granted as a religious accommodation, of the possible consequence of revocation upon his violating it? Had the inmate been talked to or given a warning after the first violation or violations? Has he been made aware that

27

violating his diet is raising questions about his sincerity? (Note: it is a good practice for a chaplain to keep a record of any warnings or counseling about the possible consequences of repeated dietary non-compliance for evidence in defense of a possible later claim of removal without any warning.) Furthermore, is it clear that the violations in question are actually violations of the inmate's religious diet? For example, not signing for a meal tray may be a violation of a facility's procedure or rules, but it is not a violation of a religious diet. Similarly, purchasing a commissary food item with egg or dairy in it would be outside a vegan diet, but would not be a religious dietary violation for an inmate whose religious beliefs only require lacto-ovo vegetarian but who was given a vegan diet as an accommodation because a vegan was the only vegetarian diet that a facility had.

So, an inmate's religious diet approval may be revoked if his own actions of repeated violations of the diet itself have demonstrated to the chaplain that he is not sincere in his asserted religious diet beliefs. Then, any revocation of a religious diet as a consequence of violating the diet is not a permanent bar. Reapplication to the diet must be a possibility; no revocation may be permanent. Minimum length of revocation, however, could be progressive. The practice of how soon there can be reapplication or how long a revocation lasts has not been the same at all facilities. Some facilities have the policy of allowing an inmate to reapply for a religious diet 60 days after a first revocation, 6 months after a second revocation and a minimum of one year after a third or more revocations. At least one facility has sort of reversed the policy by requiring an inmate who requests a special diet to remain on that diet for 6 months. Any facility, of course, should apply the same policy to all its inmates; a facility must have a consistently applied policy to avoid unequal treatment claims.

Revocation of a diet may be based on an inmate's voluntarily choosing to be removed from the diet. Or, revocation of a diet may occur against the wishes of the inmate, if an inmate violates the diet. If an inmate is taken off a religious diet because he has been repeatedly caught violating the diet, it must be made clear that the revocation is due to the violation having caused a question about his sincerity.

Some facilities view an inmate as non-compliant with the facility's diet program if he fails to sign for or come for a certain percentage of meals. Keeping track of who gets religious meals and ensuring that such meals go to the correct persons is an administrative burden and, therefore, requiring consistent participation is an administrative/penological interest. However, if an inmate is taken off a religious diet because he failed to come for or eat a certain percentage of meals, care should be taken that meals or days of meals that the inmate skips due to religious fasting not be counted in figuring a monthly compliance or non-compliance. If for example, an inmate fasts each Sabbath, that day's meals should not be counted in figuring compliance. An inmate may be required to inform the chaplain/dietary beforehand of such a regular fasting practice.

Special diets do require additional paperwork on a daily basis as well as different food procurement, which is sometimes ordered months in advance. So, not allowing an inmate to voluntarily hop on and off a religious diet readily has a legitimate penological/administrative basis. Of course, again, it is important for a facility to have a consistently applied policy to avoid unequal treatment claims.

28

**Can inmates be required to pay for the extra costs of religious diets?**
NO.  IDOC cannot require an inmate to pay or co-pay for his religious diet.  All prisons are required to feed inmates.  Moreover, all prisons are required if reasonably possible to feed inmates food/diets consistent with their religious beliefs.  An inmate has a constitutional right to receive a diet that is consistent with his religious beliefs.  (This does not mean an inmate has to be given preferred foods; this does mean an inmate cannot be given foods prohibited by his religion.  Example: A Muslim does not have to be given Halal meat; a Muslim cannot be given pork.)  Being in a special unit, such as mental health, protective custody, or segregation does not affect an inmate's right to a religious diet.

A well known decision on this issue is <u>Beerheide v. Suthers</u>, 286 F. 3d 1179 (10th Cir. 2002); here the court first rejected Colorado's food program for not meeting strict orthodox standards even though it met the basic tenets of a kosher diet, pointing out that "Kosher laws govern not only the ingredients (both animal and vegetable), but the source, storage, and preparation of those ingredients, and the service of meals.  A vegetarian meal prepared in a non-kosher kitchen is not kosher."  The Court then rejected all of Colorado's suggested alternatives including that inmates could purchase kosher meals in the canteen (i.e. their commissary), that the outside Jewish community could provide kosher food to inmates, or that inmates could make a co-payment of 25% of kosher meals.  Similarly in the August 5, 2004 decision of <u>Thompson v Vilsack</u>, 2004 WL1763228 (S.D. Iowa), the question before the court simply was "whether the State may constitutionally require Plaintiff to remit a co-payment in order to receive kosher meals."  The plaintiff had filed the action under 42 U.S.C 1983 and RLUIPA seeking to be provided with kosher meals for the duration of his commitment.  The Court acknowledged that prison officials had legitimate penological interests both in working within the parameters of a fixed budget and in reducing possible tension between those who received a more costly kosher meal and those who do not.  Nonetheless, the Court bluntly held that forcing plaintiff to remit payment for his kosher meals is <u>unconstitutional</u>, saying "the imposition of the co-payment is an invalid infringement on Plaintiff's constitutional right to free exercise of religion."  The Court noted that RLUIPA set a higher standard of review and, accordingly, "it is clear that Plaintiff would prevail under a RLUIPA analysis as well".

29