## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ALOYSIUS M. OLIVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-315-NJR-DGW |
| | ) | |
| HOWARD HARNER and | ) | |
| RICHARD HARRINGTON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff, Aloysius M. Oliver, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), brought this *pro se* action alleging his constitutional rights were violated while he was incarcerated at Menard Correctional Center ("Menard"). More specifically, Plaintiff alleges he was denied a kosher diet in contravention of his religious beliefs, which caused him to suffer headaches, stomach aches, anxiety, and weight fluctuation (*see* Doc. 1, ¶ 17).

After an initial screening pursuant to 28 U.S.C. § 1915A, Plaintiff was allowed to proceed against Howard Harner, Menard's Senior Chaplain, and Richard Harrington, the Warden of Menard at all times relevant to this matter,[1] on one count of violating his right to practice his religion under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a), and one count of

---

[1] Kimberly Butler was named the warden of Menard in April 2014 after Richard Harrington retired. ILL. DEP'T OF CORR., http://www.illinois.gov/idoc/news/2014/Pages/WardenMenardCorrectionalCenter.aspx (last visited March 17, 2016).

violating his Fourteenth Amendment equal protection rights by treating his religious diet request differently than a request submitted by a Caucasian inmate (Doc. 8, p. 4).

This matter is currently before the Court on the Motion for Summary Judgment filed by Plaintiff (Doc. 39), the Motion for Summary Judgment filed by Defendants (Doc. 40), and Defendants' Motion to Strike Plaintiff's Motion for Summary Judgment (Doc. 45). For the reasons set forth below, Defendants' Motion to Strike is granted, Plaintiff's Motion for Summary Judgment is stricken, and Defendants' Motion for Summary Judgment is granted in part and denied in part.

## I.   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. 39) & DEFENDANTS' MOTION TO STRIKE (DOC. 45)

Plaintiff filed a motion for summary judgment on June 8, 2015, arguing he is entitled to judgment as a matter of law on the issue of liability (Doc. 39). In his motion, Plaintiff asserts that the undisputed facts in this case establish Defendants violated his First Amendment rights to free exercise of his religion and his Fourteenth Amendment rights to equal protection of the law with respect to the denial of his religious diet request (*see* Doc. 39). In response, Defendants sought to strike Plaintiff's motion because he failed to support his facts with citations to materials in the record in violation of Rule 56(c)(1) of the Federal Rules of Civil Procedure (Doc. 45).

Rule 56(c)(1) sets forth the procedural requirements for supporting a motion for summary judgment and provides that "[a] party asserting that a fact cannot be or is genuinely disputed *must* support the assertion by . . . citing to particular parts of materials in the record . . . ." FED. R. CIV. P. 56(c)(1) (emphasis added). While the Court notes that the some procedural rules must give way because of the unique circumstances

of incarceration, the Seventh Circuit has held that rules still apply to uncounseled litigants and must be enforced. *See Houston v. Lack*, 487 U.S. 266 (1988); *Members v. Paige*, 140 F.3d 699, 702-03 (7th Cir. 1988).

Here, Plaintiff failed to comply with the dictates of Rule 56. His "undisputed facts" are not supported with any citation to relevant legal authority or to the record (*see* Doc. 39-2, pp. 5-6). Moreover, the Court finds that Plaintiff's motion—in particular, his "undisputed facts"—makes no mention of specific allegations against either Defendant. Although Plaintiff submitted a variety of documents, including grievances filed while he was at Stateville and Menard, the Scheduling and Discovery Order entered in this case, correspondence with religious leaders and other followers of his declared religion, and Defendants' interrogatory answers, he wholly failed to articulate how these documents support his claims or his position that the facts of this case cannot be genuinely disputed. Accordingly, the Court finds that it would have been extremely difficult, if not impossible, for Defendants to respond to Plaintiff's motion.

For these reasons, Defendants' Motion to Strike (Doc. 45) is granted, and Plaintiff's Motion for Summary Judgment (Doc. 39) is stricken.

## II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 40)

On June 11, 2015, Defendants filed a motion for summary judgment asserting they are entitled to judgment as a matter of law (Doc. 40). A review of the docket indicates that Plaintiff submitted two responses to Defendants' Motion; the first was mailed on July 14, 2015, and subsequently filed three days later (Doc. 46) and the second was mailed on July 24, 2015, and also filed three days later (Doc. 50). The Court has

reviewed both responses and finds that they are substantively identical; however, the first response filed on July 17, 2015, was filed within the proper timeframe and includes an additional exhibit. Accordingly, that is the response that will be considered by the Court, and Plaintiff's second response (Doc. 50) is stricken.

### FACTUAL BACKGROUND

IDOC Administrative Directive 04.25.102 provides that all correctional facilities "shall permit the reasonable observance of bona fide religious dietary practice" (Doc. 41-8, p. 3). To receive a religious diet, offenders must submit a written request on the designated form to the facility chaplain (41-8, p. 4; *see also* Doc. 41-6, p. 26). The offender must identify his religion, explain that the diet is part of the practice of that religion, and provide a description of the specific dietary requirement (Doc. 41-8, p. 4; *see also* Doc. 41-6, pp. 26, 32). The facility's chaplain determines whether the offender is eligible to receive the religious diet (Doc. 41-8, p. 4; Doc. 41-6, pp. 26, 32). If the inmate's dietary request is approved by the chaplain, it is forwarded to the warden of the facility, who must sign off on it (Doc. 41-8, p. 5). On the other hand, if the inmate's request is denied, the chaplain documents the reason for the denial and informs the inmate (Doc. 41-8, p. 4; Doc. 41-6, p. 34).

According to Plaintiff, he has been a practicing member of the Assembly of Yahweh since approximately 2001 (Doc. 41-1, p. 10). As a practicing Yahwist, Plaintiff is required to keep a kosher diet and refrain from eating anything that is deemed "unclean" (*Id.* at pp. 11-13). He can eat meat from animals with a "split hoof" that chew grass, but must avoid all other meat (*Id.* at p. 12; Doc. 46, p. 8; Doc. 46-2, pp. 7–8). As for

fish, he can eat them only if they have fins or scales (Doc. 41-1, p. 12; Doc. 46, p. 8; Doc. 46-2, pp. 7–8). He cannot eat unclean birds, most insects, or any animal with "paws" (Doc. 41-1, pp. 12–13; Doc. 46-2, pp. 7–8). He also cannot eat anything that has come into contact with, or has been prepared by someone who touched, something "unclean" (Doc. 41-1, pp. 12–13; Doc. 46-2, pp. 7–8).

In order to comply with this tenant of his religion, Plaintiff claims he sought and received a kosher diet in 2007 while he was incarcerated at Stateville (Doc. 41-1, pp. 14-15). The IDOC's records confirm that Plaintiff began receiving an alternative diet at Stateville on August 1, 2007, and he was still receiving it when he was transferred to Menard on July 3, 2012 (Doc. 41-6, pp. 6–7).[2] The IDOC handbook indicates that once an inmate has been approved for a religious diet at one facility, the approval and diet "should follow him automatically to any other facility," and the inmate "should not have to provide any further information or verification at the new facility that his religion practices that particular diet or that his request is sincere" (Doc. 41-6, p. 36). Despite that directive, when Plaintiff arrived at Menard, he received a regular diet (Doc. 41-1, pp. 15–16; *see* Doc. 41-6, p. 6). Consequently, about a month after arriving at Menard, Plaintiff submitted a request to receive a kosher diet (Doc. 41-2).

Defendant Harner, who was the Senior Chaplain at Menard, denied Plaintiff's request because the Offender Tracking System listed Plaintiff's religious affiliation as "African Hebrew Israelite," not "Yahwist/Hebrew Israelite" as he had indicated on his request form (Doc. 41-2; *see also* Doc. 41-6, p. 5). Chaplain Harner further noted that

---

[2] Plaintiff was taken off his vegan diet on October 29, 2011, after he was observed eating food items not on that diet (Doc. 41-6, p. 7; Doc. 46-1, pp. 45–47). His vegan diet was reinstated in May 2012, and he continued receiving it until he was transferred to Menard on July 3, 2012 (Doc. 41-6, p. 6).

Plaintiff failed to include a statement that his request was made pursuant to a sincerely held religious belief or an interpretation of a religious book (Doc. 41-2; Doc. 41-6, ¶16).

Plaintiff then wrote a letter to Chaplain Harner explaining that he is a Yahwist/Hebrew Israelite and was receiving a kosher diet at Stateville (Doc. 41-3). Chaplain Harner responded and explained that the IDOC records indicated Plaintiff was receiving a vegan diet, not a kosher diet, at Stateville (*Id.*; *see also* Doc. 41-6, p. 7).[3]   He further explained that Plaintiff could submit a change of religion form to be listed as a Yahwist and reapply for a kosher diet (Doc. 41-3; Doc. 41-6, ¶17).

Plaintiff then filed a request to change his religious affiliation to the Assembly of Yahweh on September 17, 2012, and his request was approved by Chaplain Harner six days later (Doc. 41-4; Doc. 41-6, ¶18). Accordingly, as of September 23, 2012, Plaintiff was listed as a member of the Assembly of Yahweh within the Offender Tracking system (*see* Doc. 41-6, p. 5). After Plaintiff changed his religious affiliation, he still did not start receiving a kosher diet, so he filed a grievance dated November 13, 2012 (Doc. 1, pp. 19-20). Plaintiff's counselor attempted to informally resolve Plaintiff's grievance (*Id.*; *see also* Doc. 41-7, pp. 3–4). The counselor consulted with Chaplain Harner, who said that Plaintiff had been on a vegan diet at Stateville, not a kosher diet (Doc. 1, pp. 19-20; *see also* Doc. 41-7, pp. 3–4). The Chaplain also told Plaintiff's counselor that he had advised Plaintiff on the proper procedure to request a kosher diet but Plaintiff had not yet filled out the required request form (Doc. 1, pp. 19-20; *see also* Doc. 41-7, pp. 3–4). The grievance officer denied Plaintiff's grievance on March 25, 2013, and a designee of

---

[3] The IDOC's records indicate that Plaintiff received a vegan diet at Stateville, not a kosher diet (Doc. 41-6, p. 7). Plaintiff is vehement, however, that the food he received at Stateville was, in fact, kosher (*See, e.g.*, Doc. 41-1, pp. 18–19; Doc. 46; Doc. 46-1, pp. 42-47).

Defendant Warden Harrington concurred with the grievance officer's response on May 9, 2013 (Doc. 41-7, ¶ 4, pp. 3–4).

Plaintiff again submitted a request for a religious diet on January 16, 2014, indicating that he was a member of the "Assemblies of Yahweh" and a kosher diet is an integral part of the practice of his religion (Doc. 46-2, p. 28). Plaintiff also attached a letter from an elder at his assembly (*Id.*).[4] Defendant Harner again denied Plaintiff's request because Plaintiff did not provide the specific requirements of the diet as required by "DR 425" (Doc. 46-2, p. 28; *see* Doc. 41-6, pp. 32-33). Defendant Harner approved Plaintiff for a vegan diet as "an accommodation," however, which Plaintiff started receiving in March 2013 (Doc. 46-2, p. 28; Doc. 41-1, p. 16). Warden Harrington signed off the approval of a vegan diet for Plaintiff (*see* Doc. 45-2, p. 28).

Although the vegan diet did not include any foods that violated Plaintiff's religious beliefs, the preparation of the food did (Doc. 41-1, p. 19). Eventually, Plaintiff asked to be taken off of the vegan diet because it did not agree with him, and he "couldn't keep it down" (*Id.* at p. 17). Accordingly, Plaintiff started receiving the regular diet and subsisted on salads and vegetables served with his regular food trays and supplemented his diet with kosher commissary items (*Id.* at 17, 19-21). Defendants point to Plaintiff's commissary records that indicate he has purchased various non-kosher items while at Menard (Doc. 41-9, pp. 3-25); however, Plaintiff avers that he only eats food with a kosher label on it (Doc. 41-1, p. 21).

As a result of being denied a kosher diet, Plaintiff claims that he has suffered mental harm and is being forced to break his religious commandment not to eat

---

[4] That letter does not appear to be part of the record.

anything that is "unclean or uncommon" (Doc. 41-1, pp. 23-24). Plaintiff also believes that when an individual breaks a commandment, he will not inherit eternal life (*Id.*). In his complaint, Plaintiff alleges that being forced to consume non-kosher food has caused him to suffer headaches, stomach aches, anxiety, and weight fluctuation (Doc. 1, p. 7).

Further, Plaintiff asserts that at least two other inmates at Menard receive kosher diets (Doc. 41-1, pp. 25-27). He did not know their names, but described one as "Mexican" and belongs to the "House of Yahweh," and the other as "black" and Jewish (*Id.*). Another inmate, Michael Widmer, who has been paroled, also received a kosher diet; he is described as Caucasian and his identified religion was African Hebrew Israelite (Doc. 41-1, pp. 28-29; *see also* Doc. 46-2, pp. 40-41). Plaintiff contends that Defendant Harner provided these inmates a kosher diet, but denied his request because of his race. Plaintiff claims he knows of three or four other African American inmates who were denied kosher diets who were members of the African Hebrew Israelite faith or the Assembly of Yahweh (Doc. 41-1, p. 30). Defendant Harner, however, never said anything to Plaintiff that directly related to his race (*Id.*).

## LEGAL STANDARD

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A "genuine issue" exists with respect to any such material fact . . . when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving

party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

## DISCUSSION

In their motion for summary judgment, Defendants make the following seven arguments:

(1) Plaintiff's sincerely held religious beliefs have not been substantially burdened;

(2) the IDOC policy regarding religious dietary accommodations is in full compliance with the First Amendment and the RLUIPA;

(3) Plaintiff has not demonstrated that he has a sincerely held belief requiring a kosher diet;

(4) Defendant Harrington lacks the requisite personal involvement necessary for liability;

(5) Plaintiff's First Amendment rights have not been violated;

(6) Plaintiff's Equal Protection rights have not been violated; and

(7) Defendants are entitled to qualified immunity.

Each of these arguments, with the exception of argument two, are addressed in the discussion below, although not necessarily in turn. With respect to argument two, Defendants assert without elaboration that the IDOC policy regarding religious dietary accommodations is in full compliance with the First Amendment and RLUIPA (*see* Doc. 40). Accordingly, the Court declines to specifically address this particular argument as it was wholly undeveloped. *See Raghunathan v. Holder*, 604 F.3d 371, 378 (7th Cir. 2010) ("[S]tating blankly what one's argument *is* and actually *arguing* a position are different things.") (emphasis in original).

## A. WARDEN HARRINGTON

According to Plaintiff, he brought suit against Warden Harrington simply based on his capacity as the warden and because Chaplain Harner repeatedly told him that the warden was responsible for making the decision regarding Plaintiff's diet (Doc. 41-1, p. 23). Warden Harrington asserts that he is entitled to judgment as a matter of law on Plaintiff's claims under the First and Fourteenth Amendments because he did not participate in the denial of Plaintiff's request for a kosher diet (Doc. 41, pp. 14–15).

"Section 1983 does not authorize 'supervisory liability.'" *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011). Instead, in order for a supervisor like Warden Harrington to be liable under 42 U.S.C. § 1983, "they must be personally responsible for the deprivation of the constitutional right." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (citations omitted). To be personally responsible, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (citations omitted).

Here, there is no evidence that Warden Harrington was personally involved in denying Plaintiff's request for a kosher diet. The IDOC's rules make it clear that the facility chaplain, not the warden, determines whether an inmate is eligible for a religious dietary accommodation (Doc. 41-7, ¶ 3; *see also* Doc. 41-6, pp. 26, 32-33). And if the chaplain denies an inmate's request for a religious diet, the warden does not have a duty to review that decision (*see* Doc. 46-2, pp. 29–34). The evidence suggests that procedure was followed in this case—Chaplain Harner denied Plaintiff's requests, and Warden Harrington never weighed in on the decision. Additionally, Plaintiff freely admitted at

his deposition that he had never spoken to Warden Harrington regarding his request for a kosher diet (Doc. 41-1, p. 22). Thus the undisputed evidence shows that Warden Harrington did not make or ratify the decision to deny Plaintiff's request for a kosher diet.

Warden Harrington was also not involved in denying Plaintiff's grievance submitted on November 13, 2012, regarding his request for a kosher diet. If an inmate files a grievance regarding a request for a religious diet, the warden's duty is limited to ensuring that the facility chaplain was consulted (Doc. 41-7, ¶ 3). Here, the undisputed evidence shows that Warden Harrington did not review Plaintiff's grievance (Doc. 41-7, ¶ 4; *see* Doc. 46-2, p. 27). (Doc. 41-7, ¶ 4; *see* Doc. 46-2, p. 27). Instead, the grievance indicates that Warden Harrington's designee, not the warden himself, signed the grievance indicating he concurred with the grievance officer's denial (Doc. 41-7, ¶ 4; Doc. 41-7, p. 3).

The Court notes that even if Warden Harrington had reviewed the grievance, he would still not be liable under § 1983. The Seventh Circuit Court of Appeals has determined that while a prison official may be liable if he fails to respond to constitutional violations that come to his attention via the grievance process, merely ruling against a prisoner on a grievance does not impute liability to the official. *See Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996); *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007). Here, Plaintiff's grievance was reviewed by Plaintiff's counselor, a grievance officer, and a designee of the warden. And the grievance officer's report makes clear that Chaplain Harner was consulted and did not recommend granting the grievance (Doc. 41-7, ¶4; *see*

*also* Doc. 41-7, p. 3). Thus, it is apparent that Plaintiff's grievance was not ignored, but rather, it went through the proper administrative process.

For these reasons, the Court finds that Defendant Rick Harrington was not personally involved in alleged violations of Plaintiff's rights under the First and Fourteenth Amendments. Thus he is entitled to judgment as a matter of law on both of those claims. In light of this conclusion, the Court need not reach Harrington's argument that he is protected by qualified immunity.

The Court further concludes that Defendant Harrington is not a proper defendant for Plaintiff's RLUIPA claim. A RLUIPA claim is an official capacity claim for which injunctive relief is the only available remedy. *Maddox v. Love*, 655 F.3d 709, 717 (7th Cir. 2011); *Nelson v. Miller,* 570 F.3d 868, 884–89 (7th Cir. 2009). Thus, the proper defendants are those who are responsible for ensuring that any injunctive relief is carried out. *See, e.g., Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011). Because Harrington is no longer the warden at Menard, he has no power to respond to an injunction. Accordingly, Plaintiff's RLUIPA claim must be dismissed as to Defendant Harrington.

### B. CHAPLAIN HARNER

#### 1. COUNT TWO–FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIM

Plaintiff claims his equal protection rights were violated because other inmates at Menard have received kosher diets, but his request continues to be denied because of his race. Although prisoners give up many rights of citizenship, they "do not surrender their rights to equal protection at the prison gate." *Williams v. Lane*, 851 F.2d 867, 881 (7th Cir. 1988), *cert. denied,* 488 U.S. 1047 (1989). "All equal protection claims . . . are based on the principle that, under 'like circumstances and conditions,' people must be treated alike,

unless there is a rational reason for treating them differently." *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 941 (7th Cir. 2010) (citations omitted). To state an equal protection claim, a plaintiff must establish that a state actor treated him differently from others similarly situated because of his membership in a particular class and that the state actor did so purposefully. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000) (citing *Washington v. Davis*, 426 U.S. 229, 239-42 (1976)). Discriminatory purpose "implies that the decision[-]maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group. *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982) (citation omitted).

In this instance, Plaintiff claims that three other inmates at Menard have received a kosher diet while his request continues to be denied. He testified that one of the inmates who received a kosher diet is Hispanic and a practicing member of the "House of Yahweh;"[5] the second is an African American inmate, who is a practicing Jew; and the third is a Caucasian inmate (who has since been paroled), who was an "African Hebrew Israelite" (Doc. 41-1, pp. 26-29; *see* Doc. 46, p. 10). Plaintiff further testified that he believes Defendant Harner's denial of his request for a kosher diet was based on his race because he has "gathered three or four inmates, African American inmates that are African Hebrew Israelites or Yahwist" who have also been denied a kosher diet (Doc. 41-1, pp. 30). Plaintiff admitted, however, that Chaplain Harner never said anything to him to indicate he was denying his religious diet request due to his race (Doc. 41-1, p. 30).

---

[5] At his deposition, Plaintiff was asked if the House of Yahweh religion was different than his religion, the Assembly of Yahweh (Doc. 41-1, p. 26). He responded, "yes, in certain - - yeah, in certain things, but for the most part, it's generally the same." (Doc. 41-1, p. 27).

Plaintiff's evidence is inadequate to create a material issue of fact that that he was similarly situated to the non-black inmates who received a kosher diet. Plaintiff belongs to the Assembly of Yahweh while the Hispanic inmate belongs to the House of Yahweh and the Caucasian inmate was an "African Hebrew Israelite." Because they all had different religious affiliations, they were not similarly situated. *Srail v. Village of Lisle, Ill.*, 588 F.3d 940, 945 (7th Cir. 2009) ("To be similarly situated, comparators must be 'prima facie identical in all relevant respects.'" (quoting *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 680 (7th Cir. 2005))).

Plaintiff's evidence is also inadequate to create a material issue of fact that Chaplain Harner singled out black inmates for disparate treatment. Plaintiff admitted that Chaplain Harner never said anything about race. Plaintiff also admitted that Chaplain Harner granted an African-American, Jewish inmate's request for a kosher diet. The only evidence that his dietary request was denied because of his race is Plaintiff's vague assertion that he knows of other black African Hebrew Israelites or Yahwists who were denied a kosher diet. Plaintiff offered no other specific facts or concrete details about these men, such as their names, how long they were affiliated with their religion, whether they received a religious diet at a previous institution, etc. He could not even say for certain how many men he was talking about ("three or four"). This amounts to nothing more than "a scintilla of evidence," which is insufficient to defeat summary judgment because no reasonable jury could find in his favor based on this evidence alone. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)); *Szymanski v. Rite-Way Lawn Maint. Co.*, 231

F.3d 360, 364 (7th Cir. 2000) ("[A] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion."); *Dale v. Lappin,* 376 F.3d 652, 655–56 (7th Cir. 2004) (plaintiff who offered concrete details in a sworn statement submitted enough to defeat summary judgment, whereas vague assertions are not sufficient to create a genuine issue of fact).

For these reasons, Chaplain Harner is entitled to summary judgment on Plaintiff's Equal Protection claim. In light of this conclusion, Chaplain Harner's argument that he is protected by qualified immunity need not be considered with respect to this claim.

### 2.   COUNT ONE–FIRST AMENDMENT AND RLUIPA CLAIMS

Both the Free Exercise Clause of the First Amendment and RLUIPA protect an inmate's right to practice his or her religion. Specifically, the Free Exercise Clause prohibits a prison from imposing a "substantial burden" on a "central religious belief or practice," unless the burden is reasonably related to a legitimate penological objective. *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013). RLUIPA imposes a higher standard and prohibits a prison from imposing a "substantial burden" on an inmate's religious exercise unless the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc–1(a)(1)–(2); *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008).

In order to survive summary judgment on a First Amendment claim or a RLUIPA claim, the prisoner must raise a material question of fact regarding whether prison officials substantially burdened his religious practices. *See Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016); *Koger*, 523 F.3d at 796. The prisoner must also raise a material

question of fact as to whether the burden on his religious practice was justified, meaning it furthered a legitimate and compelling state interest and was the least restrictive means available. *Thompson*, 809 F.3d at 379; *Koger*, 523 F.3d at 796.

The Court begins its analysis by asking whether Plaintiff's religious beliefs were substantially burdened when his request for a kosher diet was denied. A substantial burden "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thompson*, 809 F.3d at 379 (citations omitted). *See also Koger*, 523 F.3d at 799 ("[A] regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable.")

Defendant contends that Plaintiff's religious practice was not substantially burdened because "Plaintiff was granted a vegan diet that complied with his religious beliefs" (Doc. 41, p. 10). But this argument ignores Plaintiff's testimony that although the vegan diet did not include any foods that violated his religious beliefs, the preparation of the food did (Doc. 41-1, p. 19). As such, every vegan tray offered to Plaintiff forced him to choose between adequate nutrition and his religious practice. The Seventh Circuit "has[s] repeatedly held" that this is a substantial burden. *Thompson v. Holm*, 809 F.3d 376, 380 (7th Cir. 2016). *See also Nelson v. Miller*, 570 F.3d 868, 869 (7th Cir. 2009) (holding that inmate's free exercise rights were substantially burdened when the prison forced him to choose between his religious practice and adequate nutrition by denying his request for meatless meals on Friday); *see also Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990) (finding that failure of prison to ensure that preparation of Muslim prisoner's meals kept

pork separate from other food substantially burdened his religious practice).

Defendant also argues that Plaintiff's religious practice was not substantially burdened because his belief that his religion required a kosher diet was not sincerely held (Doc. 41, p. 11). "Sincere religious beliefs must be accommodated . . . but non-religious beliefs need not be." *Vinning-El v. Evans*, 657 F.3d 591, 593 (7th Cir. 2011). "A prison is entitled to ensure that a given claim reflects a sincere religious belief, rather than a preference for the way a given diet tastes, a belief that the preferred diet is less painful for animals, or a prisoner's desire to make a pest of himself and cause trouble for his captors." *Id.*

Chaplain Harner asserts that he "made a sincerity determination when he spoke to Plaintiff about his January 2014 request for a kosher diet" and "after speaking with Plaintiff, Defendant Harner determined that Plaintiff could not articulate what foods were prohibited by his religion or what specific requirements were of the kosher diet that he was requested" (Doc. 41, p. 12). But the evidence cited by Defendant does not establish the absence of a genuine dispute that Plaintiff's beliefs were not sincerely held. In particular, Chaplain Harner cites to Plaintiff's second request for a kosher diet and his own affidavit (Doc. 41, p. 12 (citing Doc. 1, p. 18 and Doc. 41-6 ¶19)). On Plaintiff's second request for a kosher diet, Chaplain Harner wrote that the request was denied because Plaintiff did not provide the specific requirements of the diet that is requested (Doc. 41, p. 12 (citing Doc. 1, p. 18)). In Chaplain Harner's affidavit, he explained that "a statement which includes the requirements of the diet requested assists prison officials in evaluating the sincerity of the request" (Doc. 41, p. 12 (citing Doc. 41-6 ¶19)). These

documents, however, do not establish that Chaplain Harner actually spoke to Plaintiff or otherwise attempted to determine if Plaintiff actually knew what a kosher diet entailed. These documents also do not conclusively establish that Plaintiff did not know the particulars of a kosher diet; they simply establish that Plaintiff did not write them down.

Additionally, the Court believes that "the duration of time" over which Plaintiff sought to have his request for a kosher diet accommodated is evidence that his beliefs were sincerely held. *Koger v. Bryan*, 523 F.3d 789, 797 (7th Cir. 2008). There is also evidence that at least three members of the Assembly of Yahweh contacted Chaplain Harner at Plaintiff's behest regarding his request for kosher meals (Doc. 1, pp. 12–15; Doc. 46-2, pp. 37–38). These efforts by Plaintiff tend to show that his beliefs were religious in nature and sincerely held.

Defendant also argued that Plaintiff's beliefs are not sincere because he did not adhere to them when he purchased foods from the commissary, such as tuna, mackerel, sardines, peanut butter, ramen noodles, jalapeno cheese dip, meat sticks, Back Country nuggets, and toaster pastries (Doc. 41, pp. 11–12). *See Koger*, 523 F.3d at 798 (explaining that a religious belief may not be sincerely held if there is evidence of conduct inconsistent with that belief). Importantly, however, there is no evidence that Chaplain Harner knew of these purchases prior to denying Plaintiff's request for a kosher diet. Plaintiff also squarely refutes these assertions. Plaintiff readily admits that he purchased and consumed fish products such as tuna, mackerel, and sardines from commissary, explaining that the consumption of these items is well within the parameters of his religious beliefs and points to a comment in the University of Chicago Law Review to

support this assertion (Doc. 46-2, p. 7). Gerald F. Masoudi, *Kosher Food Regulation and the Religion Clauses of the First Amendment*, 60 U. CHI. L. REV. 667, 669 (1993). Plaintiff also admits purchasing various non-kosher food items from the commissary, but asserts that he did not consume any of the non-kosher food items (Doc. 46, p. 8). Defendant has not pointed to any evidence demonstrating that Plaintiff was ever seen consuming the non-kosher food items purchased from the commissary.

For these reasons, the Court concludes that a reasonable jury could find that Plaintiff's sincerely held belief was substantially burdened when his request for a kosher diet was denied.

The Court must next ask whether the burden on Plaintiff's religious beliefs was justified or not. In doing so, the Court will first consider the standard for a First Amendment claim—whether denying Plaintiff's request for a kosher diet served a legitimate penological interest—because if Defendant cannot satisfy this standard, then he obviously cannot meet the higher standard under RLUIPA of showing that his conduct was the least restrictive means of furthering a compelling governmental interest.

"Legitimate penological interests include security and economic concerns." *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009). In determining whether an asserted justification is rationally related to a legitimate penological interest, courts consider whether there are alternative means of exercising the right that remain open to the inmate, the impact an accommodation of the asserted right would have on guards and other inmates, and whether there are "obvious alternatives" to the restriction. *Ortiz v.*

*Downey*, 561 F.3d 664, 669 (7th Cir. 2009).

Here, Chaplain Harner offers little in the way of specific justifications for his actions. He asserts that although Plaintiff asked for a kosher diet, the vegan diet that he received also complied with the tenants of his beliefs (Doc. 41, p. 13). Chaplain Harner generally asserts that kosher diets are more labor intensive for the prison to provide because all kosher meals must be prepared off-site and kept separate from other food on-site (Doc. 41, p. 13). Chaplain Harner also asserts that Plaintiff was otherwise allowed to practice his religion, including reading, studying, and keeping Shabbat (*Id.*).

The Court is not persuaded by these arguments. Once again, there is evidence that a vegan diet did not comply with Plaintiff's religious beliefs. Additionally, the evidence before the Court indicates that other inmates at Menard, including those adhering to the tenants of Judaism and African Hebrew Israelites, receive kosher meals. Defendant fails to address, and makes no attempt to quantify, the additional cost or burden of providing Plaintiff a kosher meal. And it is not readily apparent that doing so would burden prison resources when the diet is already available to other inmates at Menard.

For these reasons, the Court concludes that a reasonable jury could find that the substantial burden on Plaintiff's sincerely held belief was also unjustified. Thus Chaplain Harner is not entitled to summary judgment on Plaintiff's claims under the First Amendment and RLUIPA.

In light of this conclusion, the Court must consider Chaplain Harner's argument that he is protected by qualified immunity (Doc. 41, pp. 18–19). It is clearly established

law that "a prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition." *Nelson v. Miller*, 570 F.3d 868, 879 (7th Cir. 2009). "[H]owever, qualified immunity protects public employees who make reasonable errors in applying even clearly established law . . . ." *Grayson v. Schuler*, 666 F.3d 450, 455 (7th Cir. 2012) (citing *Vinning–El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011). In other words, Chaplain Harner is entitled to immunity if he reasonably thought Plaintiff was insincere in his religious belief, even if a judge of jury disagrees with the chaplain's conclusion. *Grayson*, 666 F.3d at 455.

Chaplain Harner argues in the memorandum supporting his motion for summary judgment that he doubted Plaintiff's sincerity (Doc. 41, p. 19). But none of the evidence before the Court suggests that is true. Chaplain Harner did not state in his affidavit that he questioned Plaintiff's sincerity (*see* Doc. 41-6). Nor did he state as much in his written explanations to Plaintiff (*see* Doc. 41-2; Doc. 41-3; Doc. 46-2, p. 28). Instead, it appears that Chaplain Harner denied Plaintiff's requests for a religious diet because he thought the forms were filled out improperly (*see* Doc. 41-2; Doc. 41-3; Doc. 46-2, p. 28). Consequently, a jury could conclude that Chaplain Harner's current stated reason for denying Plaintiff's request for a kosher diet—Plaintiff's insincerity—is really an after-the-fact justification. But even if Chaplain Harner did genuinely believe that Plaintiff was insincere, a jury could conclude that belief was not reasonable for the reasons discussed above. *See supra* pp. 17–19. Accordingly, Chaplain Harner is not entitled to qualified immunity on Plaintiff's claims under the First Amendment and RLUIPA.

## CONCLUSION

For the reasons set forth above, the Motion to Strike filed by Defendants Howard Harner and Rick Harrington (Doc. 45) is **GRANTED,** and Plaintiff's Motion for Summary Judgment (Doc. 39) is **STRICKEN.** Plaintiff's Response Opposing Summary Judgment (Doc. 50) is **STRICKEN.** Defendant Harner and Harrington's Motion for Summary Judgment (Doc. 40) is **GRANTED in part and DENIED in part**.

Plaintiff's Equal Protection claim (Count Two) is **DISMISSED with prejudice** as to both Defendant Richard Harrington and Howard Harner. Plaintiff's First Amendment and RLUIPA claims (Count 1) are **DISMISSED with prejudice** as to Defendant Richard Harrington. Richard Harrington is **DISMISSED** from this action entirely.

This matter will proceed on Plaintiff's First Amendment free exercise claim against Defendant Howard Harner in his individual capacity and Plaintiff's RLUIPA claim against Defendants Harner in his official capacity. Counsel will be recruited to represent Plaintiff at trial only. The Jury Trial is set for Tuesday, September 6, 2016 at 9:00 a.m. The Final Pretrial Conference is set for August 17, 2016 at 1:30 p.m.

**IT IS SO ORDERED.**

**DATED: March 22, 2016**

s/ Nancy J. Rosentenstengel
**NANCY J. ROSENSTENGEL**
**United States District Judge**
